LIBERTY MUTUAL INSURANCE COMPANY, as Subrogee of CHARLES MA-
CHINE WORKS, INC., Plaintiff-Appellee, *v.* WILLIAMS MACHINE & TOOL
Co., Defendant-Appellant.

(No. 57887;

First District (5th Division)—June 7, 1974.

*Modified upon denial of rehearing September 6, 1974.*

Howard & French, of Chicago (Richard G. French and Stuart N. Litwin, of counsel), for appellant.

Gerard E. Grashorn, of Chicago (Edward J. Wendrow, Frank L. Butler, and Winston & Strawn, of counsel), for appellee.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court as modified upon denial of petition for rehearing:

Defendant appeals from a judgment on a verdict for damages of $69,800 entered in plaintiff's favor. Plaintiff, as subrogee for its insured, Charles Machine Works, Inc. (Charles), had sued defendant, the manufacturer of a hydraulic pump which was a component part of a work platform manufactured by Charles, for monies paid in settlement as the result of an action brought by American Glass Co. and six of its employees for injuries sustained while using the work platform.

Charles manufactures a hydraulic work platform marketed under the name of a "Skywitch." This platform elevates workmen and material to heights of up to 24 feet. Lifting is accomplished by an electric motor which powers two cylinders with piston rods driven by the hydraulic pump. The lifting device contains two safety features designed to prevent the platform from lifting when overloaded or blocked by an obstruction. The first of these safety features is the electric motor which powers the hydraulic pump and it "engages" at the beginning of the lifting process when the weight load capacity of the particular model is exceeded. Should there be excess weight, the motor "cuts out", shutting off power to the hydraulic pump and thus preventing the elevation of the platform.

The second safety feature is the defendant's hydraulic pump unit which becomes operative in the event the platform, once it begins its ascent, becomes overloaded or encounters an obstruction or impediment. The hydraulic pump contains a relief valve, which is preset to respond to the amount of pressure introduced into the system, and when the amount of hydraulic pressure needed to sustain the lifting movement exceeds the setting on the relief valve, the valve activates and releases oil into a reservoir, so that it no longer flows into the cylinders. This

release relieves the pressure on the piston rods and causes the platform to cease elevating.

In January, 1961, Charles purchased eight hydraulic pump units from the defendant, all of which were to have the relief valve preset at 2000 pounds per square inch ("psi"), thereby providing for the relief valve to engage whenever the amount of pressure in the hydraulic system exceeded 2000 psi.[1] The record indicates that defendant was familiar with the Skywitch and the nature of its normal uses.

Defendant's pump was installed by Charles in the Skywitch involved herein. The subject Skywitch had a lifting capacity of 2000 pounds, was 21 feet in length, elevated to a height of 24 feet, was 5 feet wide, weighed approximately 6000 pounds and stood 6 feet high in its lowered position. It was equipped with removable guardrails which fitted into sockets on the side of the work platform, four leveling jacks and two outriggers used for leveling and stabilizing the unit, and was mounted on four rubber tires.

Charles did not perform any tests on the hydraulic pump purchased from defendant, but did test the Skywitch after assembly. The record reveals that Charles, by its foreman, loaded the Skywitch up to its rated capacity (2000 pounds), raised and lowered it two or three times and stopped it at intermediate positions.

In February, 1961, the subject Skywitch was delivered to Murphy's Contractors Equipment (Murphy), Charles' distributor, who in turn sold the Skywitch to the American Glass Co. (American). Upon receipt from Charles, Frank Murphy, president of Murphy, ran the platform up and down and delivered the Skywitch to American on the following day.

American purchased the Skywitch to use in the installation of glass at two terminal buildings at O'Hare Airport. American intended to use the Skywitch to lift their workmen and materials alongside the exterior portions of the terminal. Upon receipt of the Skywitch, American placed an aluminum scaffold, which consisted of three sections and weighed approximately 500 pounds, on top of the work platform. In addition to the scaffold, American placed eight to ten men on the platform and raised and lowered the platform approximately four times. According to the testimony of American's engineer, the unit worked satisfactorily. Prior to this testing, American's engineer discussed the intended use of the Skywitch with, among others, the president of Charles and Frank Murphy and decided to utilize the scaffold on the Skywitch only after

---

[1] Although the hydraulic pump was to be limited to producing a maximum pressure of 2000 psi, it could be capable of exerting at least 4000 psi if the relief valve was not properly preset.

receiving their assurances that this plan was feasible. Additionally, there was uncontradicted opinion testimony by the president of Charles that, in the absence of additional base support, the risk of the Skywitch toppling over increased in proportion to the amount of additional weight added to it.

In March, 1961, American transported the Skywitch to the job site at O'Hare Airport and reassembled the scaffolding on the work platform of the Skywitch. The Skywitch was used without incident for 3 days. On the fourth day of its use the Skywitch collapsed, injuring the workmen on it. The following testimony was adduced with respect to that accident: The Skywitch was placed on wooden planks, approximately 2 to 6 inches from the building as measured by the second floor which, because of the extension of the second floor ledge, was 4 to 5 feet away from the base of the building. The outriggers were apparently placed down, although Charles' president testified that when he observed the Skywitch the following day, the outriggers were down on only one side. Six workers boarded the scaffold while the Skywitch was fully retracted and, in addition to the weight of the scaffold and these workers, two pieces of glass, weighing approximately 100 pounds, were added. This brought the total weight on the Skywitch to approximately 1750 pounds, well within the rated weight capacity of the Skywitch (2000 pounds). The motor was turned on and the platform, with scaffold, workers and glass, began to ascend. When it reached halfway to the second floor, it stopped and remained motionless for 5 minutes, apparently because of an electrical problem. Thereafter, the platform continued its climb until it reached within a foot of the working level and then suddenly collapsed in accordion-like fashion injuring the workmen.

Charles' president visited the site on the following day and found the Skywitch covered with a tarpaulin. He testified that he observed the two cylinder rods which extend the platform were bent in a "U" shape and also that the top deck of the platform was "deformed." In addition, he found a small aluminum shaving or chip on the Skywitch, and he then noticed that an aluminum column of the building directly above the left corner of the Skywitch had a 6- or 7-inch gouge in it about 20 feet above ground level. The gouge was deeper at its top than at the bottom. He concluded that the gouge was made by the Skywitch while it ascended. Subsequent testing revealed that the aluminum chip found by Charles' president could have come from the gouged column and that the paint particles found on the chip matched the paint on the Skywitch.

The Skywitch was transported from O'Hare Airport to American's parking lot, where it was once again covered with a tarpaulin. In May, 1961, the Skywitch was examined in the parking lot by representatives

of the parties involved in a lawsuit arising out of the accident. This group included three engineers, a representative of American, and the president of Charles. Their trial testimony indicated that the Skywitch was in the same condition it had been in on the day following the accident. At this examination, the bent piston rods were removed and various measurements and observations were made with respect to them, as well as the rest of the Skywitch.

The Skywitch remained covered in American's lot and was next examined in January, 1966. Testimony indicated that the electric motor and hydraulic pump appeared to be in the same condition as when last observed in 1961. After testing the cylinder and piston rods, other tests were run on a similar Skywitch unit. The purpose of these other tests were said to be threefold: first, to perform a stress analysis of the Skywitch; second, to test the Skywitch with an overload; and third, to duplicate the 1961 accident. The stress analysis test consisted of running the Skywitch under different loading conditions and measuring the amount of stress present in the piston rods. The overload test was done by loading the platform with 3000 pounds, 1000 pounds over its rated capacity. When the platform began to rise, the motor cut out and would not lift the load.

In an effort to duplicate the 1961 accident, a similar Skywitch was loaded eccentrically with 2000 pounds (the weight on the platform being distributed unequally) and one corner of the platform being restrained so that it could not raise over 16 feet. When the platform reached the 16 foot mark and could go no further, the hydraulic pressure reached 2200 psi. The relief valve within the pump then began to operate so that the hypdraulic pressure remained the same, and the Skywitch remained stationary, indicating that the properly set relief valve operated to minimize the amount of pressure transmitted to the cylinder and piston rods.

After this test, the experts went to the American yard to test whether the hydraulic system on the subject Skywitch would relieve the pressure at 2000 psi, the presetting requested by plaintiff. The experts testified that to their knowledge the hydraulic pump was in substantially the same condition as when they last saw it in 1961. They then tested the electric motor and pump with a pressure gauge and found the readings went as high as 4300 psi. Following this, the relief valve was removed from the pump, and the experts noted that the seal placed on the valve at the defendant's factory was unbroken. Further, verification tests were run on the pump and the relief valve by the use of an accumulator[2] and

---

[2] A tank which accumulates the hydraulic oil.

these tests showed that the relief valve did not operate when the pressure reached as high as 3600 psi. One of the testing experts testified that in his opinion the hydraulic relief valve was not set to limit the pressure at 2000 psi. Moreover, at trial, one of the testing experts in response to a hypothetical question, opined that the collapse of the Skywitch was caused by its engaging the aluminum column of the terminal building during the ascendency of the Skywitch which, in conjunction with the failure of the relief valve to minimize the excess hydraulic pressure (over 2000 psi) generated as the result of meeting the column, caused the bending of the piston rods. He further testified that the piston rods would not have failed with a pressure of only 2000 psi introduced into the system.

After the last series of tests, plaintiff tendered and defendant refused the defense of the pending action against plaintiff's insured. Eventually, plaintiff settled the suit of American and the injured workmen for $69,-800 and thereafter filed this action seeking indemnity. The complaint was premised on the alternative theories of breach of warranty, strict liability and negligence. At the close of plaintiff's case and after a denial of defendant's motion for a directed verdict, the case was submitted to the jury, which returned a verdict for the plaintiff and awarded damages in the amount of $69,800.

Thereafter, defendant filed a post-trial motion seeking either a judgment notwithstanding the verdict or to set aside the verdict and judgment, or a new trial. After the denial of the post-trial motion, the instant appeal was perfected.

OPINION

## I.

■■ Defendant first contends that the court erred in refusing to permit it to prove the number of hydraulic pumps which were manufactured and sold by it allegedly without complaint or defect. In the first instance, we note that there was apparently no structural or mechanical defect in either the hydraulic pump or the relief valve, and that the failure here involved only the setting or non-setting of the relief valve. Defendant argues that its defense rested in part on proving that the relief valve was not defective when it left the defendant's control and, in order to substantiate this proposition, it was essential to introduce evidence indicating that defendant had manufactured and sold numerous pumps without incident. On this point counsel for defendant, in a colloquy with the judge and out of the presence of the jury, requested that he be allowed to introduce evidence indicating that defendant received no complaints concerning the 360,000 pumps it had manufactured. The

court sustained plaintiff's objection to the introduction of this evidence and, although it expressed its willingness to allow such testimony concerning the pumps that defendant sold to Charles, none was offered by defendant. We think that, in the absence of any proffered evidence or offer of proof on this point raised only in a discussion with the court, defendant cannot now assign error for this omission. As stated in *Ragen v. Bennigsen*, 10 Ill.App.2d 356, 135 N.E.2d 128, on pages 361-362:

> "There could be no refusal to admit that which has not been offered, and counsel cannot by engaging in mere conversation with the court, even though it may relate to procedure, or by merely stating what he desired to do, get a ruling by the court upon which he can predicate error."

■■ Secondly, the theory propounded by plaintiff as the focal point for its indemnity action was the failure of the relief valve to operate at 2000 psi, and therefore the possibility of testimony of no complaints concerning 360,000 other hydraulic pumps is not probative to the issue of whether the relief valve in question was set properly. Further, the hydraulic pump and the relief valve in question should have been operative up to pressures of 2000 psi, with the relief valve activating only when the pressure exceeded 2000 psi. Thus, the performance of 360,000 other pumps, absent proper foundation, as was the case here, would be inadmissible for any purpose. Parenthetically, we note that such testimony, even with proper foundation, would be admissible only on the question of defendant's negligence, which is not an issue in the strict liability or breach of warranty theories of recovery. For the reasons stated, we do not find the court's ruling on defendant's suggested introduction of evidence to be reversible error.

## II.

Defendant next contends that the court erred in permitting plaintiff's experts to testify as to the results of their tests on the hydraulic pump and relief valve some 5 years after the occurrence. Defendant asserts that since the component parts were exposed to the elements for 5 years, the foundation laid for the introduction of the expert testimony was insufficient in that it was not established that the pump and relief valve were in the same condition as when the accident occurred. (*Jines v. Greyhound Corp.*, 33 Ill.2d 83, 210 N.E.2d 562; *Marshall v. First American National Bank*, 91 Ill.App.2d 47, 233 N.E.2d 430.) Defendant further argues that the inspection following the accident did not include a testing of the hydraulic pump and the relief valve and, therefore, the experts should have been precluded from testifying either as to the condition of

these parts when the accident occurred or that their condition remained unchanged for 5 years.

The record reveals that American's engineer testified that the hydraulic pump was visibly in the same condition on the date of the initial testing of the Skywitch as when the accident occurred. In addition, Charles' president testified that the pump was in the same condition in 1966 as when he observed it on the day following the accident. Of greater importance is the fact, as stated by defendant in its brief, that "the pump unit *was not removed* by them [experts] on that date [of the initial inspection in 1961] nor was its housing dismantled to allow a more intimate examination of the relief valve contained within." (Emphasis added.) Therefore, it appears that up to the time of the 1966 examination, the relief valve remained encased in its original housing, immersed in its original oil supply, and untested. Moreover, and also of considerable significance, since the issue at trial was the condition of the relief valve setting, is the fact that the relief valve at the time of the 1966 test was under an unbroken seal originally placed there by defendant. The importance of the relief valve seal is indicated by certain documents of defendant offered at trial by plaintiff. One of these was a letter to plaintiff in which the following statement was made by defendant: "[T]he relief seal sleeve is to protect the relief setting of the O.E.M. [original equipment manufacturer] so that it can be detected if the relief setting has been tampered with." Another was a brochure of defendant which contained the following: "O.E.M. products are protected by relief seal sleeve and prevents any tampering with relief setting without breaking the seal."

There is no evidence in the record which would indicate that a lapse of time would adversely affect the setting on an encased and sealed relief valve. On appeal, however, defendant hypothesizes, without the benefit of any evidence, that a lapse of time and exposure to climatic conditions would create a situation changing or modifying the condition of the relief valve. In the absence of any proof on this matter, we cannot accept defendant's proposition. The fact that the seal remained unbroken for the period in question we believe should be a sufficient indication that the relief valve remained in the same condition as when it left the defendant's control. Were this not the case, then the effect of defendant's argument would be that the setting on a relief valve could be changed as the result of climatic conditions which might be an indication that its safety feature was lacking in reliability.

■■ At trial, defendant did not introduce evidence concerning other reasons for the Skywitch's collapse and, in fact, admits "that the relief valve *is* the component whose condition is really in question here." We

believe, therefore, plaintiff has laid a sufficient foundation for the introduction of its expert testimony.

We are also of the opinion that where the nature of the defect and the surrounding circumstances are such as to allow a reasonable inference that the defect subsequently established existed at the time of the accident, such evidence is admissible. (*Gass v. Carducci*, 37 Ill.App.2d 181, 190, 185 N.E.2d 285.) The court in *Gass*, distinguishing the same cases cited by defendant here, reasoned:

> "Unlike the cotter pin in the Rotche case or the plug in the Harris Furniture Company case, the spring here in question was embedded in the interior workings of an automobile door, not exposed so as to permit of casual tampering."

■■ Accordingly, where no evidence is offered to disprove the relief valve's condition was as shown by plaintiff and, in light of the relief valve being encased and its seal unbroken and, finally, because there is no testimony indicating that 5 years of outdoor exposure would cause the valve setting to change, we cannot accept defendant's argument that the admission of plaintiff's expert testimony was improper.

### III.

Defendant next argues that the evidence does not support an inference that the hydraulic pump unit was defective at the time it left defendant's control. We believe, however, that there was sufficient evidence introduced with respect to the setting on the relief valve to support the plaintiff's theory for the collapse and that the jury could reasonably infer that the relief valve was not properly set at the defendant's factory. See *McKasson v. Zimmer Manufacturing Co.*, 12 Ill.App.3d 429, 435, 299 N.E.2d 38, where it was stated:

> "Since there was sufficient evidence to substantiate the presence of defects at the time the rod was analyzed and since evidence also supported the conclusion that defects contribute to fatigue failure, the jury could infer that the defects were present at the time of manufacture and that, in the instant case, the failure occurred as a direct result."

■■ Further, defendant argues that the tests conducted on the Skywitch and its use for 2 days prior to the accident revealed no deficiency in the relief valve. We note, however, that none of the tests or the prior use of the Skywitch necessitated the operation of the relief valve inasmuch as the pressure on the platform on those occasions never exceeded 2000 psi. We thus conclude that where there is sufficient evidence based upon the testimony of several witnesses to substantiate the asserted cause of the collapse, a jury question is presented. It is only necessary that the

conclusion arrived at by the jury be based on an inference that is reasonable under the facts, and a verdict is not to be set aside because the jury could have drawn different inferences or because we, as judges, might feel that other conclusions would be more reasonable. *Spotz v. Up-Right*, Inc., 3 Ill.App.3d 1065, 280 N.E.2d 23.

## IV.

■■ Defendant also asserts that the evidence does not support an inference that American's misuse of the Skywitch was foreseeable. Defendant argues the improbability of foreseeing (1) the mounting of American's scaffold on the Skywitch; or (2) that the Skywitch would be positioned on "infirm [sic] terrain" and that, collectively, this constituted a "misuse" of the product. Defendant then contends this misuse of the product, in the absence of the foreseeability of the misuse, negates the existence of a defect and causation as well, because such misuse rather than the condition of the product itself is responsible for the injuries caused thereby. We disagree. First, the addition of the scaffold by American, coupled with the workmen and materials, did not bring the weight on the platform above its rated capacity. To this extent, there was no misuse by American. Even assuming that the addition of the scaffold contributed in some manner to the contact with the aluminum column, one of the purposes of the relief valve was to operate when something prevented the ascent of the platform. Defendant asserts in its brief that "There was no overload on the Skywitch and had it not come into contact with the building the accident would never have happened." This is true, but we believe from the evidence that the relief valve was designed to operate in an emergency such as occurred here, and that as to the relief valve there was no misuse; rather, it appears that the occasion arose when it should have operated.

Based upon Illinois interpretation of the foreseeability test, "that which is objectively reasonable to expect" (*Winnett v. Winnett*, 57 Ill.2d 7, 310 N.E.2d 1), we believe it was foreseeable that a situation of the type here might arise necessitating the activation of the relief valve.

## V.

Defendant also contends that the independent negligence of plaintiff's insured contributed to the cause of the occurrence and thereby precluded restitution by indemnity. Specifically, defendant attributes to plaintiff the following acts of "independent negligence": (1) a failure to adequately test the relief valve by loading the platform in excess of its rated capacity; and (2) a failure to warn American of the precariousness of using the Skywitch in the manner contemplated by them.

■■ Defendant then reasons that "as a *joint tortfeasor* plaintiff simply was not entitled to indemnification." However, most recently in *Kossifos v. Louden Machinery Co.*, 22 Ill.App.3d 587, it was held that the negligence of the assembler of component parts does not preclude recovery and indemnity against the manufacturer of a defective part on the theory of strict liability. Concerning the defendant manufacturer's contention that the assembler was contributorily negligent, the *Kossifos* court stated:

> "In *Williams v. Brown Mfg. Co.*, 45 Ill.2d 418, 261 N.E.2d 305, the court held that a greater degree of culpability than ordinary negligence on plaintiff's part was necessary in order to preclude recovery from a manufacturer strictly liable in tort. In holding that contributory negligence was not a bar to recovery in a strict product liability action against a manufacturer, the court, in effect, designated strict product liability as a more serious tort than the tort of ordinary negligence. See also *Meador v. City of Salem*, 1 Ill.2d 572, 284 N.E.2d 266."

■■ Similarly, in *Stanfield v. Medalist Industries, Inc.*, 17 Ill.App.3d 996, 1000, 309 N.E.2d 104, where the plaintiff brought a strict liability action against the defendant manufacturer who, in turn, sought indemnity against the plaintiff's employer for its alleged active negligence. The court, in citing the Restatement of Torts position, adopted in *Suvada v. White Motor Co.*, 32 Ill.2d 612, 210 N.E.2d 182, noted that the independent negligence of the employer cannot be the basis for an indemnity action brought by a manufacturer held strictly liable:

> "We conclude, therefore, that actions founded on strict liability for defective and unreasonably dangerous products are outside the active-passive theory of indemnity. Hence, third-party actions for indemnity against a subsequent user are not maintainable by the manufacturer or seller of the defective product."

See also *Burke v. Sky Climber, Inc.*, 13 Ill.App.3d 498, 301 N.E.2d 41, which involved a suit for injuries against a scaffold manufacturer who, in turn, filed a third-party claim for indemnity against Chicago Housing Authority, the employer of the original plaintiff. It was stated there, at page 504:

> "It is Sky Climber's theory here that it had legal right to bring an action over against CHA for common law indemnity. Sky Climber concedes here that no Illinois court has ever held that this type of action is permissible. But it urges 'that there are neither practical nor theoretical nor policy reasons which should preclude such an action.' We cannot agree.
> In our opinion, the basic underlying reasons of policy, as ex-

pressed in *Suvada*, should be operative here to prevent this type of indemnity. Sky Climber is the manufacturer and distributor of this product and therefore presumably the one who reaped the profits from its manufacture. Hence, the ultimate liability, if there be one because of a defective or unreasonably dangerous condition of the product when it left the manufacturer's possession, should rest upon Sky Climber as creator of the product."

Defendant maintains that because *Kossifos, Stanfield* and *Sky Climber* involve suits by a party in the manufacturer-distribution chain against a purchaser-user of a product which caused injury to an employee of that user, that they are distinguishable from the instant case, which involves a manufacturer-assembler and the manufacturer of a component part. We note, however, that although plaintiff is a manufacturer-assembler, it is also a purchaser-user of defendant's pump unit, and we believe that the reasoning of those three cases applies here, so that "the defense" of plaintiff's negligence is not available to defendant.

■■ Therefore, the failure of plaintiff to test the Skywitch and warn American, if such duties exist, does not eliminate defendant's responsibility to correctly preset the relief valve, nor does any such alleged failure on plaintiff's part constitute an intervening cause of the accident vitiating defendant's liability.

As to plaintiff's count sounding in negligence, we note that the jury was properly instructed on this facet of plaintiff's theory for recovery and also on the necessity for plaintiff to establish the exercise of its subrogees' due care. On the factual question presented to it, the jury found no negligence on the part of Charles, so that the conduct alleged here by defendant as constituting negligence has already been determined. (*Bolander v. Gypsum Engineering, Inc.*, 87 Ill.App.2d 325, 329, 231 N.E. 2d 659.) Our review of the record does not lead us to believe that this finding was against the manifest weight of the evidence, and we are therefore constrained to follow the finding made in the trial court.

## VI.

■■ Finally, defendant asserts error in the trial court's decision to give certain jury instructions tendered by plaintiff on the issue of negligence, since, as it claims, there was no evidence offered by plaintiff on the question of negligence. We note that with respect to plaintiff's instructions 1-B (dealing with the issue of negligence) and 3 (concerning plaintiff's burden of proof on the question of negligence), there were no objections made by defendant to them at the conference on instructions. Therefore, by the failure to object at the conference on instructions, defendant waived any error in the giving of these instructions. (*Boone*

*v. Baker,* 9 Ill.App.3d 509, 292 N.E.2d 461.) Defendant did, however, make a general objection to plaintiff's instruction 15, which defined negligence. In view of the fact that the court, without any objection from defendant, gave the aforementioned instructions, 1-B and 3, on plaintiff's negligence theory, it was necessary that the jury be instructed on the definition of negligence. In view thereof, we believe that no error was committed by the court in the allowance of these instructions.

Even assuming there was no evidence on the issue of negligence, we believe that the evidence offered at trial amply supported the general verdict returned by the jury. On the question of whether to invoke the presumption that a general verdict is based upon the evidence which supports the valid counts or issues, the court in *Huckabee v. Bell & Howell, Inc.,* 102 Ill.App.2d 429, 243 N.E.2d 317, stated on page 442:

> "Where the reviewing court can see the case has been fairly tried, and that the judgment is clearly right upon the facts, and that consequently another trial must necessarily result the same way, it will not reverse on the ground that an erroneous issue has been submitted to the jury."

Accordingly, we find that the jury reached its verdict based upon those issues supported by the evidence and that its decision was correct.

For the foregoing reasons, the judgment is affirmed.

Affirmed.

DRUCKER and LORENZ, JJ., concur.