CORRADO WIEDEMANN, Plaintiff-Appellee, v. THE INDUSTRIAL ERECTORS, INC., Defendant-Appellant (Humphrey Elevator and Truck Co. *et al.*, Defendants).

First District (1st Division)   No. 84—0034

Opinion filed September 23, 1985.

48

Haskell & Perrin, of Chicago (John J. Lynch and Dion J. Sartorio, of counsel), for appellant.

Fred Lambruschi and A. Mark Ialongo, both of Chicago (Sidney Z. Karasik, of counsel), for appellee.

JUSTICE CAMPBELL delivered the opinion of the court:

On November 20, 1979, plaintiff, Corrado Wiedemann, assistant food and beverage manager at McCormick Inn, Chicago, sustained severe injuries when he was thrown over the top of the manlift he was riding in the 23rd Street Parking Garage (the garage), situated adjacent to McCormick Inn. Plaintiff filed suit to recover damages for his injuries against three defendants: Humphrey Elevator and Truck Co., Inc. (Humphrey), manufacturer of the manlift, on a strict products liability theory; The Industrial Erectors, Inc. (Industrial), designer, distributor and installer of the manlift, on strict products liability and negligence theories; and 23rd Street Park, Inc., operator of the garage, on a negligence theory. At the conclusion of plaintiff's case in chief, 23rd Street Park, Inc., reached a $50,000 settlement with plaintiff and was dismissed from the action. Following trial, the jury returned a verdict in favor of Humphrey and against Industrial, assessing total damages against Industrial in the amount of $950,000, which was reduced to $807,500 in recoverable damages as a result of a determination that plaintiff was 15% contributorially negligent. Upon motion by Industrial, the trial court further reduced the damages by $50,000, the amount of plaintiff's settlement with 23rd Street Park, Inc. The trial court denied Industrial's post-trial motion for judgment notwithstanding the verdict and also denied plaintiff's post-trial motion for judgment notwithstanding the verdict or for new trial against Humphrey. Industrial's timely appeal followed. Plaintiff did not appeal the judgment entered for Humphrey.

On appeal, Industrial contends that the trial court erred in denying its (1) post-trial motion for judgment notwithstanding the verdict; (2) motions for a directed verdict; and (3) conditional motion for a new trial. For the following reasons, we affirm the judgment of the trial court.

Prior to discussing the events leading up to the accident, a brief explanation of the basic purpose and operation of the garage manlift is necessary. The manlift is a specially designed continuous vertical conveyor belt, principally used to transport car hikers employed by the garage to and from the various parking levels. Occasionally, employees of McCormick Inn also use it to go to and from their own

cars. The manlift travels at 72 feet per minute through a shaft from the ground floor of the garage to the three underground parking levels (levels "B", "C", and "D") and back up again.

To board the manlift, the rider grabs onto a handle located on the belt, and stands on a protruding step while facing the belt. To ride to a lower parking level, the rider boards the downside of the manlift, *i.e.*, the side of the belt moving in a downward direction. To ride up from one of the underground parking levels, the rider boards the upside. The belt is not marked as to which side moves upward and which side moves downward. If the belt if moving, the direction is obvious. However, if the belt has been stopped, the only way to determine which side is the upside is to look at the upper curve of the belt, which is approximately 10 feet above the ground floor. The side of the belt equipped with a safety bar immediately below the curve is the upside. The bar is used to prevent someone from riding over the top of the manlift. The evidence is unclear as to whether the upper curve of the belt is visible from the underground levels.

On the ground floor of the garage, the manlift is enclosed in a separate room behind the cashier's cage. Although there is some gating around the shaft at this level, it is not installed so as to prevent a person from inadvertently boarding the manlift on the upside. Because the parking levels are underground, there would be no reason to purposely board the upside of the manlift on the ground floor.

Ordinarily the manlift is continuously moving and a rider will simply jump on and off at the desired parking level while it is in motion. However, if necessary, it can be stopped manually by pulling the start/stop rope in the direction of travel, *i.e.*, pull it down on the downside, up on the upside. In addition, the manlift will stop automatically if any one of three safety devices located on the ground level is triggered. These safety devices shut down the electrical circuitry. Once shut down, the circuitry must be reactivated by a key reset switch which works by inserting a key, turning it and pushing the key inward to depress the reactivation button. The key is then turned again and removed from the switch. After the circuitry has been energized, the manlift is set in motion by pulling the start/stop rope in the opposite direction of travel. The conveyor belt is imprinted with the words: "To stop, pull rope." However, there is no indication as to in which direction the rope should be pulled.

The main purpose of the three safety devices located on the ground level is to prevent someone who is riding on the upside from inadvertently riding over the top of the belt as it curves into the downward direction. The primary safety device is the "split rail de-

vice" and is located approximately six inches above the ground floor. If the rider is still standing on the manlift step when the step reaches this point, a wheel on the step will depress a microswitch which shuts down the manlift. The second safety device, a photoelectric cell, is located approximately six feet above the ground floor and casts a beam from right to left across the belt. If any part of the rider's body breaks the beam, the conveyor belt will automatically shut down. The third safety device or "redundant safety device" is the previously-mentioned safety bar, located approximately four feet above the photoelectric cell. The bar lies loosely in two brackets, one on each side of the belt, and is also attached to a chain. One bracket contains a switch; the other is merely a holder. If any part of the rider's body hits the bar and dislodges it from the switch side, the manlift will automatically stop. Once dislodged, the bar will dangle from the safety chain.

The record reveals that on November 20, 1979, approximately 9:30 p.m., plaintiff boarded the manlift on the ground floor of the garage, intending to ride it down to the level on which his car was parked. There is conflicting evidence as to whether the manlift was moving at the time plaintiff boarded it. Instead of boarding the downside of the belt, plaintiff boarded the upside and, consequently, was thrown over the top of the manlift as it curved in the downward direction. Plaintiff hit his head on the brick wall and landed on the concrete floor. None of the safety devices acted to stop the manlift.

At trial, Joseph Pieczara, plant manager for McCormick Inn, testified that he and his maintenance staff were responsible for the daily maintenance of the manlift. On the ground floor of the garage, there were two signs located next to the manlift. One read, "Employees Only, Visitors Keep Off"; and the other read, "Top Floor, Get Off." Stenciling on the belt indicated, "Face the belt, use the hand hold."

Pieczara further testified that when the belt was originally installed by Industrial in 1972, a push-button device, without a key, was used to energize the circuitry. In 1977, a city of Chicago ordinance required that a key reset switch be installed to replace the push-button. This change was initiated after the city learned that the push-button could be jammed into a depressed position which would bypass the safeties.

When Pieczara arrived at the scene of the accident the following morning, the top safety bar was dangling by the chain. It appeared to be out of both brackets. After resetting the bar, Pieczara reactivated the circuitry with the key reset switch, pulled the start/stop rope, and the manlift began to operate. Pieczara then checked all the safety de-

vices and found them to be in good working order. Based upon what he saw that morning, Pieczara surmised that some object had struck the safety bar, but he did not know how the safeties could have been bypassed.

On cross-examination, Pieczara stated that during the period from 1973 to 1979, the McCormick Inn maintenance staff had replaced certain parts on the manlift. Whenever the task required more than mere replacement, Pieczara would call a repairman from Industrial. The McCormick Inn maintenance staff had not substantially changed anything on the manlift since its original installation in 1972. Pieczara further stated that in May 1980, they experienced trouble with the key reset switch, which had been installed in 1977. Specifically, the key would not come out of the switch properly. The maintenance staff notified Industrial of the problem, and Industrial supplied an identical replacement.

Pieczara explained that if a person boards the manlift at ground level when the step is above the split rail safety device, that safety device will be bypassed. In addition, it is possible for a rider to avoid the photoelectric beam while standing in a normal position on the manlift. In fact, Pieczara had been present when Humphrey's expert witness, Frank Walton, avoided both safety devices and almost went over the top of the manlift before someone pulled the start/stop rope.

Bomer Matejka, maintenance man at McCormick Inn, testified that Industrial installed the first key reset switch on the garage manlift in 1977. In 1980, Matejka replaced the switch with an identical one supplied by Industrial. Matejka thought the reason for replacement was the misplacement of one of the keys to the switch. Sometime between 1977 and 1980, Matejka also had replaced a piece of corroded wire in the "D" level safety step. However, the replacement wire did not alter the overall wiring of the manlift and was not related to the functioning of the ground level safety devices. Matejka further stated that he personally inspected the manlift every morning and had found nothing wrong with it on the mornings before or after the accident.

Gerald Cole, president of Industrial, testified that the button on the key reset switch is designed to spring back once it is depressed by the key. In order to override all of the safeties, the button would have to remain in the depressed position. In 1977, Industrial became aware that all safeties could be bypassed by depressing the key, but did not inform McCormick Inn or the garage of this discovery. Cole personally knew of no reset buttons that had ever stuck in the depressed position. Cole also stated that unless the top safety bar was dislodged

from the switch side and not just from the nonswitch side, the manlift would not stop.

Warren Matthies, president of Humphrey, testified that although Humphrey supplied the manlift components to Industrial, Humphrey did not supply the gating/guarding and did not design or install the electrical circuitry. Originally, Humphrey supplied Industrial with a suggested wiring diagram based upon Industrial's manlift drawing, but that diagram had not been used. Industrial had the overall responsibility for designing and installing the electrical circuitry on the manlift. Humphrey also supplied the split rail device and the safety bar, but did not ship them in position. Industrial installed them and also supplied and installed the photoelectric eye. Matthies confirmed that it is possible to bypass the split rail safety device and photoelectric eye by boarding the manlift above the split rail safety and positioning oneself in such a manner as to avoid the photoelectric beam.

Matthies further stated that Humphrey supplies all installers of its manlifts with a copy of the American National Safety Institute Code (ANSI Code), which provides the minimum safety standards for installation and gating/guarding of manlifts. According to the ANSI Code, entrances and exits at all manlift landings are to be guarded by railings with gates. If there is no gate installed in front of the upside of a manlift, the gating does not comply with the ANSI Code. It is customary in the trade for the installer to supply the gating/guarding. Matthies stated that he did not know that all safety devices on the manlift could be bypassed by depressing the key reset switch. According to Matthies, if Humphrey's wiring diagram had been used by Industrial, the safety devices would not have been overridden. Although Matthies had never heard of anyone riding over the top of a manlift, he could understand how a person wanting to travel downward would panic when the lift started moving in the opposite direction and pull the wrong way on the rope.

Peter Barroso, senior mechanical engineer, testifying as an expert witness for plaintiff, outlined the unreasonably dangerous conditions present on the garage's manlift. In particular, Barroso noted that there was no indication on the belt as to which was the upside and which was the downside; there was no information as to in which direction the start/stop rope was to be pulled; and all safeties could be bypassed by depressing the button on the key reset switch.

Following plaintiff's case in chief, Industrial moved for a directed verdict on the grounds that plaintiff had not proved any defective condition that proximately caused the accident and that there was no evidence that the key reset switch which was in place at the time of

the accident had malfunctioned. The court denied the motion, stating that plaintiff's allegations were not limited to the key reset switch, but also included the wiring which had been present at all times.

Ralph Daehn, consulting engineer, testified on behalf of Industrial that when he inspected the manlift in January 1983, he concluded that it had been properly installed, was safe, and in accord with city of Chicago requirements; warnings signs were appropriate; and "up" and "down" designations were unnecessary.

During the testimony of Frank Walton, Humphrey's expert witness, a videotape demonstrating the operation of the manlift was shown to the jury over Industrial's continuing objection. Walton reiterated that Humphrey had not supplied the electrical wiring, electrical starter or key reset switch. the key reset switch was supplied by Industrial, and the wiring diagrams were prepared by Industrial. Further, Walton stated that Industrial, as general contractor, was in the best position to supply suitable gating and guarding. Walton concurred with previous testimony that if the button on the key reset switch remains in a depressed position, the safeties will not function. In Walton's opinion, a properly applied and maintained reset button would have prevented the accident. Further, if an installer knew safety devices could be bypassed, he would be expected to inform the user.

At the conclusion of all testimony, Humphrey moved for a directed verdict. The court granted Humphrey's motion as to the question of wiring, but denied it as to the questions of guarding and warning signs. Industrial's motion for a directed verdict was denied.

JUDGMENT NOTWITHSTANDING THE VERDICT

■■ Industrial first contends that the trial court erred in denying its motion for judgment notwithstanding the verdict. Industrial asserts that plaintiff offered no evidence as to the existence of a defect or malfunction in the manlift at the time of the accident. Instead, all of the evidence offered as to the condition of the manlift was derived from inspections made nearly two years after the accident and approximately 16 months after the key reset switch had been replaced. Industrial argues that because the manlift, key reset switch and electrical circuitry were not in the same condition at the time of the inspection that they were in at the time of the accident, any testimony regarding the former condition was incompetent and inadmissible. Specifically, Industrial alleges eight errors of admissibility of evidence made by the trial court.

The first three alleged errors concern admission of the testimony

of Peter Barroso, plaintiff's expert; Frank Walton, Humphrey's expert; and Warren Matthies, Humphrey's president, regarding their inspections of the manlift made subsequent to the accident. Barroso's and Walton's inspections took place on September 10, 1981. Matthies' inspection took place on May 31, 1983.

It is well established that testimony based on post-accident inspections is not competent unless evidence is also introduced to show that the relevant conditions of the inspected site had not changed during the period between the accident and the inspection. (*La Salle National Bank v. Feldman* (1966), 78 Ill. App. 2d 363, 372, 223 N.E.2d 180.) Moreover, where the nature of the alleged defect and the surrounding circumstances of the accident are such as to allow a reasonable inference that the defect observed upon inspection also existed at the time of the accident, testimony based on the post-accident inspection is allowed. *Liberty Mutual Insurance Co. v. Williams Machine & Tool Co.* (1974), 21 Ill. App. 3d 510, 316 N.E.2d 255; *Gass v. Carducci* (1962), 37 Ill. App. 2d 181, 190, 185 N.E.2d 285.

In the case at bar, Joseph Pieczara, plant manager for McCormick Inn, testified that although the key reset switch in place at the time of the accident had been replaced prior to the inspections, the replacement switch supplied by Industrial was identical to the original. With respect to the wiring, Pieczara and Matejka both testified that the electrical wiring for the manlift safety devices had never been altered. Matejka admitted that he had changed one wire since the accident because of corrosion, but explained that that wire was on the lowest level ("D" level) of the garage and had no relationship to the circuitry for the upper level safety devices. In our opinion, the aforementioned testimony provides ample evidence that the condition of the manlift, key reset switch and electrical circuitry had remained substantially unchanged during the period between the accident and the inspections.

In addition, it was uncontradicted at trial that the key reset switch and electrical circuitry in place at the time of the inspections created an unreasonably dangerous condition similar, if not identical to, that alleged to exist at the time of the accident. Pieczara testified that the key reset switch in place at the time of the accident was replaced because the key would not come out properly. The same defect was found to occur in the replacement switch at the time of the inspections. Barroso, plaintiff's expert witness, testified that at the time of his inspection, all safeties could be bypassed by depressing the key reset switch. According to Gerald Cole, Industrial's president, Industrial had known since 1977 that the safeties could be bypassed, yet

had failed to inform either McCormick Inn or the garage.

■ Based upon the aforementioned testimony, we find that the nature of the alleged defects in the circuitry and key reset switch coupled with the surrounding circumstances of the accident permit a reasonable inference that the unreasonably dangerous conditions established upon post-accident inspection of the manlift existed at the time of the accident. Therefore, we conclude that the trial court properly admitted the testimony of Barroso, Walton and Matthies as to their post-accident inspections.

■ Industrial next contends that the trial court erred in permitting Humphrey to show a videotape to the jury demonstrating the operation of the manlift which depicted a key reset switch that was not in place at the time of plaintiff's accident. Industrial claims that that portion of the videotape which showed Frank Walton, Humphrey's expert, jiggling the key in the reset switch unfairly preconditioned the minds of the jurors to accept the possibility that the key would stick.

The decision whether to admit evidence which reconstructs the scene of an accident rests in the sound discretion of the trial judge and will not be disturbed absent a clear showing of abuse of that discretion. (*Hubbard v. McDonough Power Equipment, Inc.* (1980), 83 Ill. App. 3d 272, 404 N.E.2d 311.) Reconstruction evidence is considered competent if the essential elements of the scene are substantially similar to those existing at the time of the accident. (*Ryan v. Blakey* (1979), 71 Ill. App. 3d 339, 389 N.E.2d 604.) With respect to the videotape in question, we do not find that the trial court abused its discretion. As discussed, the evidence is overwhelming that the essential elements of the manlift at the time the videotape was made were substantially similar, if not identical to those existing at the time of the accident. Furthermore, the videotape bore a direct relationship to the specific facts of the occurrence and was relevant to instructing the jury as to the use of the manlift.

■ Industrial next contends that the trial court erred in admitting testimony that Humphrey's expert nearly fell over the top of the manlift while testing it. In order for evidence of subsequent accidents to be admissible, a foundation must be laid showing that the relevant equipment was in substantially the same condition at the time of the first and subsequent accidents. (*Mahoney v. Roper-Wright Manufacturing Co.* (7th Cir. 1973), 490 F.2d 229.) As previously stated, the evidence established that neither the manlift nor the electrical circuitry for the safety devices had been substantially changed in any way, and that the replacement for the key reset switch was identical to that in place at the time of the accident. Therefore, we conclude that a

proper foundation had been laid for testimony as to Walton's near accident, and the testimony was properly admitted into evidence.

▮ Industrial next argues that the court erred in striking the testimony of Matejka, maintenance man, as to his routine maintenance of the manlift and in refusing to admit into evidence Matejka's work report for the date on which he had replaced a corroded electrical wire on the manlift. Industrial's argument on this point is somewhat misleading in that Matejka's testimony regarding the replacement wire was presented to the jury without any subsequent instruction to disregard it. Matejka testified that the wire he replaced was in the "D" level controls and had no relationship to the circuitry for the ground floor safety devices. Moreover, he had simply replaced a corroded wire with an identical wire in good condition. In a side bar following Matejka's testimony, the trial court agreed with plaintiff that evidence as to routine maintenance on the manlift was irrelevant, but stated that it would confuse the jury unnecessarily to strike some evidence as to maintenance or replacements and not all such evidence. Thus, the jury was aware of and could consider all maintenance work done on the manlift subsequent to the accident. Industrial claims that it was prejudiced because the trial court's ruling precluded it from arguing the impact of routine maintenance in its closing argument. We are not persuaded that Industrial was prejudiced by the trial court's ruling.

Industrial next argues that the trial court erred in allowing Joseph Pieczara to answer plaintiff's question as to whether the manlift had been "substantially changed" since it was originally installed in 1972. Industrial contends that use of the phrase "substantially changed" was prejudicial and misleading. Because Industrial fails to indicate how Pieczara's response was prejudicial or misleading and does not provide any legal support to buttress its conclusion, we deem this issue waived for review. *Reeder v. Old Oak Town Center* (1984), 124 Ill. App. 3d 1045, 465 N.E.2d 113.

▮ In conclusion, we find that the trial court properly admitted evidence as to the post-accident condition of the manlift, the key reset switch and the electrical circuitry and that the evidence overwhelmingly favored the jury's verdict. Consequently, we affirm the trial court's denial of Industrial's motion for judgment notwithstanding the verdict.

DIRECTED VERDICT

▮ Industrial next contends that the trial court erred in denying its motion for directed verdict at the close of plaintiff's case in chief,

and, again, at the close of all evidence. Industrial presents two arguments in support of this contention. The first is a reiteration of the inadmissibility of post-accident evidence argument. Our decision that the trial court properly admitted evidence as to the post-accident condition of the manlift obviates the need for further discussion of this issue. Industrial's alternative argument rests on the premise that assuming *arguendo* that the manlift's electrical wiring was defective at the time of the accident, it furnished only a condition by which plaintiff's injury was made possible, and was not the proximate cause. Industrial asserts that because activation of the key reset switch was necessary "to bring the wiring into play," it cannot be construed to have been the proximate cause of plaintiff's injury.

It is well established that where causes combine to produce injury, the causal connection between the defective product and the injury is broken only if the acts or omissions of others were improbable or unforeseeable. (*Doren v. Pullman Standard Car Manufacturing Co.* (1977), 45 Ill. App. 3d 981, 360 N.E.2d 440.) Thus, whether there was a causal connection between the defective wiring and plaintiff's accident initially depends upon whether it was foreseeable by Industrial that the key reset switch would be activated and that the safeties could be bypassed. The record clearly demonstrates that these occurrences were foreseeable by Industrial. Gerald Cole, president of Industrial, testified as to the use of the key reset switch and also admitted to having knowledge two years prior to the accident that all safety devices on the manlift could be bypassed if the key either stuck or was held in the depressed position. Although Cole denied having any knowledge that the key occasionally would stick in the depressed condition, Pieczara testified that he had ordered a replacement reset switch from Industrial because he was having problems with removal of the key. Because Industrial supplied the replacement switch, it is reasonable to infer that Industrial had knowledge that there had been a problem with the original switch. Accordingly, we conclude that the causal connection between the defective wiring and plaintiff's injury was not broken and affirm the trial court's denial of Industrial's motions for a directed verdict.

NEW TRIAL

Industrial next contends that the trial court erred in denying defendant's conditional motion for a new trial predicated upon prejudicial errors committed during trial and the overall unfairness of the proceedings. Specifically, Industrial alleges that the trial court erred by (1) admitting evidence as to post-accident inspections of the

manlift; (2) granting plaintiff's motions *in limine* which prevented reference to the fact that plaintiff had been drinking alcoholic beverages at an office Christmas party just prior to the accident; (3) giving plaintiff's jury instruction regarding the alleged unreasonably dangerous aspects of the manlift; and (4) refusing to give Industrial's jury instruction that any award to plaintiff is nontaxable.

Regarding the question of admissibility of evidence, our previous decision that the trial court properly admitted evidence as to the post-accident condition of the manlift, the electrical circuitry and the key reset switch precludes further discussion of this allegation of error. With respect to the motions *in limine* regarding plaintiff's consumption of alcoholic beverages, it is well established that evidence of alcoholic consumption is improper unless it can be shown that plaintiff was intoxicated. As stated by this court in *Sandburg-Schiller v. Rosello* (1983), 119 Ill. App. 3d 318, 331, 456 N.E.2d 192, "Evidence of alcoholic consumption is so prejudicial that more than mere drinking must be shown. Instead, actual intoxication must be established, indicating physical or mental capabilities."

■■ In the present case, when plaintiff moved to disallow mention of his alcoholic consumption or attendance at a Christmas party shortly before the accident, the trial court asked Industrial if it had any evidence that plaintiff had been "under the influence." Industrial replied that it did not. Accordingly, the trial court granted plaintiff's motions "subject to change in the event that [Industrial is] able to show me out of the presence of the jury that [it] can show he was under the influence." No such evidence was ever introduced. Consequently, we find the court properly granted plaintiff's motions *in limine*.

■■ With respect to plaintiff's strict liability jury instruction, the instruction alleged that the manlift was unreasonably dangerous in either one, some or all of the following ways: (1) electrical circuitry allowed safety devices to be bypassed; (2) Industrial failed to warn McCormick Inn that the safety devices could be bypassed; (3) Industrial failed to properly guard or fence the manlift; (4) Industrial failed to indicate the upside or downside of the manlift; and (5) Industrial failed to install a grab bar. Upon review of the record, we find sufficient evidence to support the aforementioned allegations and, thus, conclude that the trial court did not err in giving the instruction to the jury. *Davelis v. Central Engineering Co.* (1980), 86 Ill. App. 3d 593, 408 N.E.2d 218.

■■ Lastly, Industrial argues that it was error for the trial court to have refused a jury instruction that any award in favor of plaintiff

60

would not be subject to income tax. The Illinois Supreme Court recently addressed this issue in *Klawonn v. Mitchell* (1985), 105 Ill. 2d 450, 475 N.E.2d 857, and held that in cases involving purely State law, juries should not be advised as to the nontaxability of damage awards. Accordingly, we affirm the trial court's decision to deny Industrial's jury instruction.

For the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

BUCKLEY, P.J., and O'CONNOR, J., concur.