ROBERT OAKES, Plaintiff-Appellee, v. GENERAL MOTORS CORPORA-TION, Defendant-Appellant and Third-Party Defendant-Appellant (Leonard A. Potter, Defendant and Third-Party Plaintiff-Appellee).

First District (6th Division)  No. 1—91—3691

Opinion filed November 12, 1993.—Modified on denial of rehearing January 28, 1994.

Lord, Bissell & Brook, of Chicago (Susan E. Mason and Howard A. Silverman, both of General Motors Corporation, Evan A. Burkholder, Hugh C. Griffin, David R. Reed, Margaret S. Hickey, and Sandra K. Macauley, of counsel), for appellant.

Charles J. Reed, Richard D. Trainor, and David H. Lucas, all of Reed, Scoby & Trainor, Ltd., and David A. Novoselsky, of David A. Novoselsky & Associates, both of Chicago, for appellee Robert Oakes.

JUSTICE McNAMARA delivered the opinion of the court:

This cause arises out of a collision of two vehicles which resulted in the paralysis of plaintiff, Robert Oakes. The jury returned a joint and several verdict of $7 million against defendant, General Motors, which manufactured plaintiff's vehicle, and codefendant, Leonard Potter, who drove the vehicle which struck plaintiff. The trial court entered judgment on the verdict, and it is from this judgment that General Motors now appeals. (Potter admitted negligence at trial, and the jury was instructed that the only issue as to Potter was the

amount of plaintiff's damages. On Potter's contribution claim against General Motors, the jury allocated 7% fault to General Motors and 93% to Potter. Potter raises no issues on appeal.) General Motors contends that: (1) the evidence failed to establish any enhanced injury attributable to a defective seat; (2) the trial court erred in refusing to instruct the jury on the concept of "enhanced injury"; and (3) the trial court erroneously excluded testing evidence that was critical to the enhanced injury issue and to the issues of proximate cause and defect.

The relevant facts are as follows. On February 10, 1983, shortly after 8 p.m., plaintiff was stopped at a traffic light in his 1982 Chevrolet Camaro Berlinetta when he was rear-ended by Potter, who was driving a four-wheel drive pickup truck with a snowplow bracket mounted on its front end and roofing shingles in the truck bed. Plaintiff was alone in his vehicle and was not wearing a seat belt. Plaintiff was later diagnosed as sustaining an axial fracture of the cervical vertebrae, resulting in permanent incomplete quadriplegia.

Within minutes, fire department and paramedic personnel arrived at the scene. Four of these individuals testified at trial that plaintiff was observed inside the vehicle with his feet near the brake and gas pedals, his buttocks on the console area separating the two front bucket seats and his head in the right rear corner of the rear passenger compartment.

Lawrence Naddy, a firefighter and paramedic for the Village of Midlothian, testified that the passenger compartment of plaintiff's vehicle had suffered only minor damage, and the rear left passenger seat, although slightly bowed, was still intact. The roof was almost in its normal position, and the rear passenger seatback was in a normal upright position, as if there had been no impact. The driver's seatback was in a fully reclined position.

Jeffrey Floyd, a firefighter and paramedic for the Oak Forest fire department, examined plaintiff's vehicle while the roof was still in place and plaintiff still inside. Floyd observed that the back of the driver's seat was completely reclined and was resting on the seat in the left rear passenger area. The front passenger seat was in its normal position, and, apart from the position of the driver's seat, the remainder of the vehicle's interior was intact, with no noticeable damage. He testified that the only exterior damage was to the trunk-hatch area, noting that the left rear had substantially more damage than the right rear of the vehicle.

Stephen Morgan, a firefighter for the Village of Midlothian, observed the driver's seatback in a nearly fully reclined, almost flat position and stated that there were no obstructions in the rear seat

area preventing the driver's seat from lying flat. The remainder of the interior was still intact, with the rear seatback in its normal position.

Susan Arnoni, an emergency medical technician for the Oak Forest police department, testified that the interior of the car appeared normal, and there was sufficient room for plaintiff's seatback to be in a fully reclined position. From her vantage point on the passenger side, she was able to see plaintiff's seat cushion but could not see the seatback since Naddy was in the car obstructing her view.

Paramedic William Doepp, plaintiff's nephew, examined and photographed the car in a tow yard on February 11, 1983, the day after the collision. Doepp testified that the driver's seatback was in an upright position resting against some sheet metal and other car parts which had been placed in the vehicle's rear passenger area. Upon kneeling on the bottom cushion of the driver's seat, Doepp stated that the seat suddenly moved forward. Doepp then grabbed the bottom seat cushion and discovered that it slid back and forth freely in its track without having to maneuver any controls. When he moved the seat forward, Doepp noticed that the driver's seatback stayed in contact with the debris, reclining on its own, and when he moved the cushion backward, the seatback moved freely into an upright position.

Plaintiff called several expert witnesses to render opinions regarding the speed of the impact; whether the collapse of the driver's seatback was a defective condition of the vehicle; the causal relationship between the collapse of the seatback and the injury sustained by plaintiff; and the injuries which would have resulted had the seatback remained upright.

Rudolf Limpert, Ph.D., a mechanical engineer and accident reconstructionist, opined that the impact speed of Potter's truck, based on an estimated truck weight of 7,000 pounds, was between 31 and 36 miles per hour, producing a change of velocity or "Delta V" (representing the speed generated by an impacted vehicle at the moment of collision) of between 18 to 21 miles per hour. Limpert concluded that plaintiff would have endured the collision without serious injury, given the impact speed and Delta V of the collision, had the seatback not collapsed. Limpert opined that the seatback would have acted as a restraint mechanism, just as a seatbelt would in a front-end collision, and would have prevented any abnormal deflections or forces upon plaintiff's neck and head. Had the seatback remained in an upright position, according to Limpert, plaintiff would not have impacted the rear seatback. He concluded that the driver's

seat in plaintiff's vehicle was unreasonably dangerous "because it failed in this fairly low Delta V rear-end collision."

Limpert also stated it was his opinion, based on a review of photographs of the vehicle and statements of eyewitnesses, that the rear seat of the vehicle was in its normal position and that there were no obstructions preventing the driver's seatback from fully reclining. He concluded that the cause of the seat collapse was the failure of the recliner mechanism. In his view, the teeth of the mechanism either slipped or broke, allowing the seatback to recline. The failure of the recliner mechanism, in Limpert's view, eliminated the only means of restraining plaintiff in an upright position when he was struck by Potter and caused plaintiff instead to be propelled towards the rear, ultimately causing his spinal injury.

Limpert disagreed with the testimony of General Motors' experts that the impact speed was 45 to 50 miles per hour. In Limpert's opinion, the speed of impact was much lower. He based this conclusion on the fact that plaintiff's vehicle traveled only 109 feet after impact, while at the speed suggested by General Motors, plaintiff's vehicle would have traveled at least 138 feet. Moreover, he stated that at an impact speed of 45 to 50 miles per hour, Potter's truck would have traveled 77 feet after impact. In fact, the truck traveled only 45 to 50 feet.

On cross-examination, Limpert stated that he had not analyzed the occupant kinematics in this case, which he defined as the study of what happens to an occupant's body when subjected to the motion and forces of a given impact. Limpert could not offer an opinion as to the precise degree of angle at which a seatback loses its ability to restrain an unbelted occupant, but stated that at 25 degrees, or at an upright position, the occupant would likely not move at all.

Leon Kazarian, a biomechanical engineer, testified on plaintiff's behalf regarding the cause of the spinal injury. Kazarian concluded that the only way plaintiff's injury could have occurred was if his head had been rammed backward in a diagonal fashion impacting the rear seatback, which he believed cupped plaintiff's head and brought it to a stop with his body following in an axial alignment, producing a fracture of the cervical, or neck, area of his spine. Kazarian opined that the seatback collapse was the cause of plaintiff's injury and that plaintiff would not have sustained a serious injury but for the collapse of the seatback. Kazarian stated that if the driver's seatback had remained upright, plaintiff's body would have gone back into it, and he would thus have had uniform surface contact over the back side of his body. A seatbelt would not have prevented plaintiff's injury since, in Kazarian's view, a seatbelt is only effective in front-end collisions, not rearward impacts.

Kazarian disagreed with General Motors's theory that plaintiff's head struck the roof upon impact. Kazarian stated that if plaintiff's head had hit the roof, he would have sustained an anterior wedge-type fracture of his cervical spine because his chin would have been forced to his chest. He also would have suffered a head injury or concussion as a result of his head hitting the roof. Plaintiff sustained none of these injuries.

On cross-examination, Kazarian acknowledged that an occupant could ramp out of his seat into the roof area of the vehicle depending on the angle of the seatback. However, he disagreed that there would be serious spinal cord injury as a result of hitting the roof at the impact speed involved in this collision.

John Stilson, an automotive engineer, testified on behalf of plaintiff as an expert on automotive safety and rendered the opinion that an impact in the range of 21 to 24 miles per hour Delta V is absolutely survivable without serious injury if the seat system is designed properly. Stilson opined that the driver's seatback in plaintiff's vehicle failed in that it collapsed rearward upon impact to the point of contact with the rear seat cushion. He based this conclusion in part on the fact that the seatback was not deformed or bent backwards, as it would have been had the recliner mechanism functioned properly. In Stilson's view, the only way that the seatback could have moved backward was if the recliner mechanism had failed, noting that the only thing holding the seat up was that mechanism. Stilson believed that the recliner mechanism was unreasonably dangerous in design since under conditions of impact or even normal operation by an occupant, the seatback would become loaded by the weight of the occupant and collapse, propelling the occupant toward the rear of the vehicle. The defective and unreasonably dangerous condition of the seatback used in plaintiff's vehicle arose because the recliner teeth did not always fully engage and were insufficient in size and strength to withstand a moderate rear impact without releasing. Stilson quoted from numerous complaints of users of General Motors automobiles who reported that the driver's seatback sometimes fell backward on its own.

Stilson expressed the opinion that a feasible alternatively designed recliner mechanism employing continuously engaged gears on both sides of the seat, known as a dual rotary recliner, was a superior design and would have provided triple the resisting strength of the unit in plaintiff's vehicle. This alternatively designed rotary recliner was being used on other selected models of 1982 Camaro Berlinetta automobiles manufactured by General Motors, and had been in use since 1979. It would have eliminated the hazard of

incomplete teeth engagement and collapse as existed in the "arm and pawl" type recliner used in plaintiff's vehicle.

On cross-examination, Stilson acknowledged that the recliner mechanism used in plaintiff's automobile met the requirements of the applicable Federal safety standards. He also acknowledged that plaintiff, prior to this accident, had not experienced any slippage of the driver's seatback.

Stilson stated that he could design a seat that could withstand an impact with a Delta V of 30 miles per hour and allow the occupant to survive without serious injury. Stilson acknowledged that no seatback provided by any car manufacturer in 1982 would have withstood a Delta V impact of 30 miles per hour without the seatback collapsing rearward. Stilson added, however, that there were automobiles whose seat structure would not collapse in a Delta V of 20 miles per hour, which he opined was roughly the speed traveled in this collision. In Stilson's view, a seat could be designed with a stiffer back that would not deform past 30 degrees in a collision up to 40 miles per hour Delta V. He had never designed such a seat, and no such production seat existed. Stilson opined that the rotary-type recliner, if present in plaintiff's car, would have yielded slowly, would not have permitted the seatback to recline entirely and would have prevented plaintiff's injury.

Stilson expressed no criticism of the structure of the seat in this case and made no recommendation for a structural alternative design. Stilson's sole criticism was with the failure of the recliner mechanism, which ultimately caused the seatback to collapse and substantially contributed to plaintiff's injury.

At trial, General Motors denied that there was any design or manufacturing defect in the driver's seat of plaintiff's vehicle. General Motors' experts all concluded that if the driver's seatback did collapse as plaintiff claimed, it was not due to any defect in the seat but to the severity of the rear-end impact and plaintiff's failure to wear a seat belt. General Motors's experts also concluded that plaintiff would have suffered an equally or more serious spinal cord injury had the driver's seatback remained in a rigid, upright position. As we will note later, General Motors on appeal has acknowledged that the conflicting evidence on the defect issue created a question of fact for the jury.

During the instructions conference, General Motors offered a variety of instructions pertaining to the concept of enhanced injury. The trial court rejected the instructions on the ground that enhanced injury was not an issue in this case. Instead, the trial court gave the jury the standard Illinois Pattern Jury Instructions pertaining to joint tortfeasors, concurrent causes, and burden of proof.

■ The issues which General Motors raises on appeal center around what has come to be known as the "crashworthiness" or "second collision" theory of liability. (See *Huddell v. Levin* (3d Cir. 1976), 537 F.2d 726.) In *Larsen v. General Motors Corp.* (8th Cir. 1968), 391 F.2d 495, the court defined the essence of this theory:

"Any design defect not causing the accident would not subject the manufacturer to liability for the entire damage, but the manufacturer should be liable for that portion of the damage or injury caused by the defective design over and above the damage or injury that probably would have occurred as a result of the impact or collision absent the defective design." (*Larsen*, 391 F.2d at 503.)

In the cases following *Larsen*, that portion of the damage or injury "over and above the damage or injury that probably would have occurred as a result of the impact or collision absent the defective system" has come to be known as the "enhanced injury." See, *e.g., Huddell*, 537 F.2d 726.

General Motors contends that the trial court erred in precluding it from developing the enhanced injury theory at trial. It requests this court to grant a judgment in its favor, or, alternatively, to remand for a new trial, on the grounds that the trial court failed to require plaintiff to offer evidence of an enhanced injury at trial; failed to instruct the jury on the issue of enhanced injury; and erroneously excluded the interior camera shots of a test run by an independent testing agency which would have shown that no enhancement of injury occurred.

In response, plaintiff contends that General Motors has waived its opportunity to argue these issues on appeal because it failed to raise them in the trial court. He further contends that, even if the issue of enhanced injury is not waived, General Motors nevertheless may not prevail on appeal because the theory has been expressly rejected by our supreme court under circumstances where the injury sustained by plaintiff is incapable of being logically or reasonably divided or apportioned among defendants.

Without discussion, we reject plaintiff's assertion that General Motors has waived the issue of enhanced injury. We will consider General Motors' argument on appeal.

At oral argument, counsel for General Motors agreed that the jury had found in plaintiff's favor on the issue of whether the driver's seatback was defective, and that there was sufficient evidence to support that finding. General Motors maintains, however, that it should be liable only for the enhanced injury, if any, stemming from the defect.

Recognizing that the issues General Motors raises with respect to the enhanced injury theory of liability will be rendered moot if we find that such a theory does not apply under the circumstances presented in this case, we shall begin our discussion by addressing this particular point: Whether the trial court erred in finding that the concept of enhanced injury was not applicable in this case.

General Motors asks this court to find, as a matter of Illinois law, that a plaintiff who suffers an indivisible injury as a result of the conduct of a negligent driver and a manufacturer of a defectively designed vehicle must separate out the enhanced injuries in order to recover from the manufacturer. Plaintiff argues, on the other hand, that his burden of proof against the manufacturer in such a case is no different from his burden in any other tort claim. In support of this contention, plaintiff cites *Burke v. 12 Rothschild's Liquor Mart, Inc.* (1992), 148 Ill. 2d 429, 593 N.E.2d 522, a case recently decided by our supreme court. Plaintiff argues that although *Burke* was not a "crashworthy" or "second collision" case, the principles which it espouses should nevertheless be applied here.

In *Burke*, the plaintiff was injured by the negligent acts of Rothschild's' employees and then was further injured by the acts of Chicago police officers when they threw him into the back of a police vehicle. The city argued in a post-trial motion and again before the appellate court that it was a successive tortfeasor and should thus be liable only for the injuries caused by its conduct. (On appeal to the supreme court, the plaintiff, rather than the city, argued that the defendants were successive tortfeasors, and the city argued that it and Rothschild's acted jointly.) In an effort to reaffirm and clarify Illinois law, our supreme court distinguished separate from joint tortfeasors by focusing on the nature of the injury itself.

Citing *Gertz v. Campbell* (1973), 55 Ill. 2d 84, 302 N.E.2d 40, *overruled on other grounds* (1981), 85 Ill. 2d 1, 421 N.E.2d 886, the court noted that the defendant motorist and defendant physician in *Gertz* were not joint tortfeasors in part because the injuries were sustained at different times. (*Burke*, 148 Ill. 2d at 437, 593 N.E.2d at 525.) The *Burke* court further noted that "inherent to the *Gertz* analysis was the recognition that the plaintiff's original injury—a broken leg—could be distinguished from the physician's aggravation of that injury, which resulted in amputation of the leg." (*Burke*, 148 Ill. 2d at 437-38, 593 N.E.2d at 525.) In the court's view, "[t]hese were separate and distinct injuries, for which defendants could not be held jointly liable." *Burke*, 148 Ill. 2d at 438, 593 N.E.2d at 525.

The *Burke* court reiterated that the test of jointness in Illinois is the indivisibility of the injury, citing with approval section 433A of the Restatement (Second) of Torts, which states:

"(1) Damages for harm are to be apportioned among two or more causes where

(a) there are distinct harms, or

(b) there is a reasonable basis for determining the contribution of each cause to a single harm.

(2) Damages for any other harm cannot be apportioned among two or more causes." Restatement (Second) of Torts § 433A (1965).

The court also cited with approval the comment to subsection (2) above, which explains:

"Certain kinds of harm, by their very nature, are normally incapable of any logical, reasonable, or practical division. *** By far the greater number of personal injuries, and of harms to tangible property, are *** single and indivisible. Where two or more causes combine to produce such a single result, incapable of division on any logical or reasonable basis, and each is a substantial factor in bringing about the harm, the courts have refused to make an arbitrary apportionment for its own sake, and each of the causes is charged with responsibility for the entire harm." Restatement (Second) of Torts § 433A, Comment *i*, at 439-40 (1965).

Applying section 433A and comment *i* to the facts in *Burke*, the court concluded that since the plaintiff's injuries caused by the first tortfeasor (Rothschild's) had been "exacerbated and/or that he had received an additional injury through his subsequent mishandling by the City's employees," the plaintiff had suffered an indivisible harm rendering Rothschild's and the city jointly liable for the entire extent of his injuries. (*Burke*, 148 Ill. 2d at 439, 593 N.E.2d at 526.) In this regard, the court stated:

"There was no clear medical evidence to show either that Burke's irreversible quadriplegia came about solely through negligence of Rothschild's or that the paralysis caused by behavior of Rothschild's was a temporary condition capable of reversal absent the City's misconduct. *Either injury or both injuries could have caused plaintiff's lasting condition. Burke's quadriplegia was an indivisible harm. Consequently, we agree that the trial court properly found Rothschild's and the City jointly liable to plaintiff.*" (Emphasis added.) *Burke*, 148 Ill. 2d at 439, 593 N.E.2d at 526.

In *Buehler v. Whalen* (1977), 70 Ill. 2d 51, 374 N.E.2d 460, a case strikingly similar to the present case, plaintiffs contended that the vehicle in which they were riding was struck in the rear at 30 miles per hour. The plaintiffs' experts opined that the gas filler spout had been displaced from its normal position upon impact; the gas cap came off; fire emanated from the trunk and spread into the passenger compartment; and that a feasible design alternative was a firewall

between the fuel tank and passenger compartment which would have diminished plaintiff's injuries. The plaintiffs' experts concluded that with the alternative safer design, the spread of fire would have been delayed long enough to permit the occupants to get out "without suffering serious injury." *Buehler*, 70 Ill. 2d at 57, 374 N.E.2d at 462.

Defendant, Ford Motor Company, vigorously contested each of the opinions of the plaintiffs, contending that the gas cap had remained on the filler spout; the fire came from outside the vehicle; no fuel had entered the trunk compartment; the impact speed was 45 miles per hour; and it was impossible to build a feasibly designed firewall. (*Buehler v. Whalen* (1977), 41 Ill. App. 3d 446, 355 N.E.2d 99.) Ford claimed that its fuel tank was not defective and that the fire was proximately caused by the high-speed collision and the negligence of the driver, Whalen.

Our supreme court was asked by defendant Whalen to apportion damages between herself and Ford. The court examined the nature of the respective responsibility of the auto manufacturer whose uncrashworthy design combined with the negligence of a driver who precipitated the collision. The court stated:

> "We have here a classic case of concurrent tortfeasors whose separate acts combine to produce a single individual injury. *Under these circumstances there is no apportionment.*" (Emphasis added.) (*Buehler*, 70 Ill. 2d at 63, 374 N.E.2d at 465.)

The court in *Buehler* ultimately held that given the indivisible nature of plaintiffs' injury, *i.e.*, severe burns, each defendant was jointly and severally responsible for the entire extent of plaintiffs' damages. *Buehler*, 70 Ill. 2d at 64, 374 N.E.2d at 465.

General Motors attempts to distinguish *Buehler* by asserting that no burden of proof issue existed there because it was undisputed that all the injuries for which plaintiff sought recovery were enhanced injuries and that no injury at all would have occurred absent the alleged crashworthiness defect. We do not agree. On the contrary, our reading of *Buehler* reveals that Ford, like General Motors here, strenuously disputed the manner in which plaintiffs sustained their indivisible injuries; that a defect existed; the speed of impact; the proximate cause of plaintiff's injuries; and the feasibility of an alternative design. (*Buehler*, 41 Ill. App. 3d 446, 355 N.E.2d 99.) We see no difference, therefore, between the situation in *Buehler* and the situation here for the purpose of determining the measure of liability on the part of General Motors.

■ The holdings in *Burke* and *Buehler* demonstrate that the trial court correctly determined that the concept of enhanced injury was not at issue here. It is clear from those two cases alone that in Illinois,

defendants are to be held jointly and severally liable when the plaintiff's injury is indivisible, assuming, of course, that evidence exists to support a finding that each defendant proximately caused the plaintiff's injury. Like the plaintiff in *Burke*, plaintiff's injury here was quadriplegia, and we concur in the supreme court's view that such an injury is indivisible. The combination of Potter's negligence and General Motors' defectively designed seating system was "a classic case of concurrent tortfeasors whose separate acts combine to produce a single individual injury." *Buehler*, 70 Ill. 2d at 63, 374 N.E.2d at 465.

General Motors argues, notwithstanding the holdings in *Burke* and *Buehler*, that application of the enhanced injury doctrine in crashworthiness cases does not require that the injuries be divisible. It maintains, rather, that the doctrine requires the jury to compare all the injuries plaintiff actually sustained in the accident (divisible or indivisible) against all the injuries (divisible or indivisible) that plaintiff would have sustained in the accident absent the alleged defect. Moreover, General Motors argues that the burden is on the plaintiff to prove the enhanced injuries. In an effort to convince this court of the wisdom of this view, General Motors cites a number of Federal court decisions and decisions of courts of other jurisdictions which have adopted the enhanced injury theory of liability requiring the plaintiff to prove an enhanced injury in order to recover from the manufacturer.

The case chiefly relied upon by General Motors is *Huddell*, 537 F.2d 726. In *Huddell*, the driver of a General Motors vehicle was killed in a rear-impact collision with another vehicle. The decedent's wife brought an action against the driver of the vehicle alleging negligence, and against General Motors on the ground that the driver's seat head restraint was defectively designed and was a substantial contributing factor of the decedent's death. In vacating the jury's verdict in favor of plaintiff and against General Motors, the third circuit held that the plaintiff had failed to meet the three-pronged burden of proof under the crashworthiness doctrine. In what has come to be known as the "*Huddell* rule," the plaintiff, in order to recover from the manufacturer, must prove:

> (1) the existence of an alternative safer design;
>
> (2) the injuries he would have sustained had the alternative safer design been employed at the time of the accident; and
>
> (3) the extent of the enhanced injuries attributable to the defective design.

See *Huddell*, 537 F.2d at 737-38.

This formulation of the enhanced injury doctrine would require a

plaintiff who sustains injuries as a result of the defective design of an automobile to separate those injuries sustained as a result of the defect from those injuries which he would have sustained in the occurrence absent the defect. As plaintiff points out, under this rule, he would be required to establish what injuries he might have received even though he did not receive them. In other words, plaintiff would have to prove a negative based on a hypothetical set of facts. We consider this to be a nearly insurmountable burden, particularly here, where plaintiff's injury is incapable of being logically or reasonably divided. In *Larsen*, the defendant, General Motors, concurred in this view. Ostensibly arguing against the enhanced injury doctrine in that case, General Motors contended that the enhanced injury arising from a design defect would be "difficult to assess." (*Larsen*, 391 F.2d at 503.) It is ironic that here, notwithstanding the indivisible nature of plaintiff's injury, the determination of the enhanced injury, in General Motors's view, is an easy feat.

The decision in *Mitchell v. Volkswagenwerk, AG* (8th Cir. 1982), 669 F.2d 1199, highlights the practical difficulties created in requiring application of the *Huddell* rule to an indivisible injury situation. In *Mitchell*, the plaintiff sustained a severe spinal injury ultimately resulting in paraplegia after he was ejected through a defective door of the vehicle in which he was a passenger. The jury determined that plaintiff's paraplegia was a divisible injury and thus apportioned the damage award between the driver of the vehicle and the manufacturer. On appeal, the eighth circuit, which, significantly, was the same court that 14 years earlier had advanced the enhanced injury doctrine in *Larsen*, held that the trial court erred in failing to rule that the paraplegic injury was indivisible as a matter of law and was therefore not capable of apportionment. The court stated that "[u]nder these circumstances the jury should have been instructed that if it found the defective design was a substantial factor in producing the paraplegia, the manufacturer would be liable as a joint and several tortfeasor with the driver of the car." *Mitchell*, 669 F.2d at 1201-02.

In so holding, the *Mitchell* court recognized that under Minnesota law, "where two or more persons acting independently are guilty of consecutive acts of negligence closely related in point of time, and cause damage to another under circumstances where the damage is indivisible, i.e., it is not reasonably possible to make a division of the damage caused by the separate acts of negligence, the negligent actors are jointly and severally liable." *Mitchell*, 669 F.2d at 1203, citing with approval Restatement (Second) of Torts § 433A, Comment *i* (1965).

Acknowledging that some of the other circuits had taken the view that in "second collision" cases the plaintiff had the burden of proving not only that the manufacturer was the sole cause of an enhanced indivisible injury, but also that he would not otherwise have received injuries absent a defect, the eighth circuit ultimately rejected this approach as difficult and unworkable:

"The primary difficulty we have with this analysis is that it forces not only the parties but the jury as well to try a hypothetical case. Liability and damage questions are difficult enough within orthodox principles of tort law without extending consideration to a case of a hypothetical victim. More realistically, the parties and jury should direct their attention to what actually happened rather than what might have happened.

By placing the burden of proof on a plaintiff to prove that the designer was the sole cause of not only an enhanced indivisible injury, but, in addition, that he would not otherwise have received injuries absent a defect, the injured victim is relegated to an almost hopeless state of never being able to succeed against a defective designer. The public interest is little served. *We write to reaffirm that Larsen was not intended to create a rule which requires the plaintiff to assume an impossible burden of proving a negative fact. A rule of law which requires a plaintiff to prove what portion of indivisible harm was caused by each party and what might have happened in lieu of what did happen requires obvious speculation and proof of the impossible. This approach converts the common law rules governing principles of legal causation into a morass of confusion and uncertainty.*" (Emphasis added.) (*Mitchell*, 669 F.2d at 1204-05.)

The court ultimately set forth the plaintiff's burden in a "second collision" case: The plaintiff must show only that the design defect was a "substantial factor" in producing damages over and above those which were probably caused as a result of the original impact or collision. The court went on to hold that if the manufacturer's negligence is found to be a substantial factor in causing an *indivisible* injury such as paraplegia or death, then "absent a reasonable basis to determine which wrongdoer actually caused the harm, the defendants should be treated as joint and several tortfeasors." *Mitchell*, 669 F.2d at 1206.

We concur in the foregoing analysis of the eighth circuit and find the sound reasoning contained therein to be in line with our supreme court's holdings in *Burke* and *Buehler*. *Mitchell* clearly shows the sort of speculation in which a jury would be forced to engage in apportioning damages between concurrent tortfeasors where the injury is indivisible, and where no reasonable basis exists to

determine which wrongdoer actually caused the harm. In *Mitchell,* there was conflicting evidence as to whether the paraplegic injury was incurred when the car rolled over or when the plaintiff was ejected from the vehicle through the defective door. Similarly, in this case, there was conflicting evidence as to whether plaintiff's quadriplegic injury was caused by plaintiff hitting his head on the rear passenger seat after the driver's seatback failed or by ramping up the seat, hitting his head on the roof upon impact. The trial court observed that plaintiff's injury happened within a "split second," and that it was caused either by one or both defendants. The jury ultimately accepted plaintiff's evidence that his injury was proximately caused by the concurrent actions of both defendants.

We need not explore any of the other non-Illinois cases cited by General Motors which have accepted the *Huddell* rule as a viable theory of liability. As the foregoing discussion makes clear, we do not find the *Huddell* rule to accurately reflect the current state of the law in Illinois with respect to concurrent tortfeasor liability in an indivisible injury situation. In summary, we hold that the trial court properly determined that the concept of enhanced injury was not an issue in this case. Accordingly, we find that the trial court did not abuse its discretion as to any of the three issues General Motors raises on appeal.

As a final matter, General Motors requests this court to address an additional contention related to the interior camera shots taken during its crash test, which, as we have concluded, were properly excluded on the issue of enhanced injury. General Motors argues that the camera shots were admissible as well on the issues of proximate cause and defect. The camera shots showed an instrumented "dummy" ramping out of a rigidly designed, upright driver's seat into the roof of the test vehicle upon impact, at an impact speed of 48.8 miles per hour and a resulting Delta V of approximately 30 miles per hour. In conducting the test, General Motors sought to rebut the testimony of Stilson, one of plaintiff's experts, who stated that, although he had never seen one, a safer seat could be designed with a stiffer back that would not deflect past 30 degrees in a rear-end collision up to 40-miles-per-hour Delta V (the equivalent of an impact speed of approximately 55 to 60 miles per hour). General Motors intended to show that, contrary to Stilson's testimony, such a seatback would not have been safer in a collision *as severe as plaintiff's,* because had plaintiff ramped into the roof, as the camera shots indicated he would have, his spinal injury would have been equally if not more severe than that which he actually sustained. Thus, even if defective, the seatback could not have been a proximate

cause of plaintiff's injuries since he would have been injured to the same extent absent the defect. Nor, General Motors argues, could the existing seatback have been considered "defective" since even Stilson's proposed alternative design would not have been effective in preventing serious spinal cord injury to plaintiff "in an impact of the type and severity that occurred [in plaintiff's collision]."

■ For the reasons which follow, we reject General Motors's argument, and thus find that the trial court's exclusion of the evidence was proper. If the purpose of the crash test was, as General Motors suggests, to prove that Stilson's proposed seatback design would not have been effective in preventing plaintiff's spinal injury "in an impact of the type and severity that occurred here," it follows that the test should have been conducted under conditions which replicated, to the extent possible, an impact of that type and severity. The trial court excluded the evidence after determining that the test vehicle was impacted at a substantially higher speed than was plaintiff's vehicle. Indeed, Stilson opined that the Delta V which resulted in plaintiff's collision was between 15 and 20 miles per hour, 10 to 15 miles per hour lower than the Delta V which resulted in the test collision. Thus, although the "dummy" ramped into the roof while seated in the Stilson-type seat in the test collision, it does not necessarily follow that plaintiff would have done the same given the considerably lower speed of the impact in his collision. Indeed, plaintiff himself acknowledges that had the impact occurred at the speed of the test collision, "there would have been no room for [his] seat to collapse and whatever the demerits of [the] seat they would not have been manifest." Plaintiff's theory at trial with respect to the seatback was that he would have survived this accident without serious injury had the seatback not been defective, *precisely because it was a "fairly low Delta V" collision*. Stilson opined that a stiffer seatback design existed at the time plaintiff's vehicle was manufactured *which would have withstood a collision of this severity*. Had that design been tested in such a collision and failed, the evidence would indeed have been relevant and admissible to refute plaintiff's claim that the defective seatback proximately caused his injuries. Under the circumstances here, however, we agree with the trial court that the evidence was properly excluded.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

EGAN, P.J., and GIANNIS, J., concur.