In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-3855

DONALD MALEN and
SHARON MALEN,

*Plaintiffs-Appellants,*

*v.*

MTD PRODUCTS, INC. and
HOME DEPOT U.S.A., INC.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 6478—**Charles R. Norgle, Sr.,** *Judge.*

ARGUED OCTOBER 27, 2009—DECIDED NOVEMBER 19, 2010

Before EASTERBROOK, *Chief Judge,* and EVANS and
WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Donald Malen slipped while
getting off his reconditioned riding lawn mower and
injured his foot on the rotating blade. He and his wife
sued the manufacturer and seller, claiming that the
mower was defective in design and construction. The

district court granted summary judgment for the defendants because undisputed evidence established that Malen's own actions were the sole proximate cause of his injury. But viewing the record in the light most favorable to the plaintiffs and taking all inferences in their favor, we conclude that a jury could find that the mower was both defective and the proximate cause of Malen's injury. Therefore, we reverse the district court's grant of summary judgment in favor of the defendants and remand for further proceedings.

## I. BACKGROUND

Before his injury Malen had operated riding lawn mowers for more than 40 years. In 2001 he purchased a Yard-Man riding mower at Home Depot that was manufactured by MTD Products in 1998 and advertised as "Reconditioned Power Equipment" with a "Full Manufacturer's Warranty." The mower was designed with a safety interlock system. One component of that system is the Operator Presence Control, or OPC, a device which kills the engine if the operator rises from the seat without first disengaging the cutting blade and setting the parking brake. A second component is the "no cut in reverse" switch, or NCR, which kills the engine if the operator shifts into reverse without first disengaging the blade. The American National Standards Institute ("ANSI")[1] did not make an NCR compulsory

---

[1] ANSI is a voluntary organization that develops nationwide consensus standards for a variety of devices and procedures.
(continued...)

until 2003, but by 1996 the organization had mandated that riding mowers had to have an OPC that will stop the engine and fully arrest the blade within five seconds of being triggered. Before Malen purchased the mower, he tested it under the supervision of a Home Depot sales employee. During that test ride Malen never rose from the seat with the engine running, but it is not disputed that he operated the machine in reverse while the blade was engaged.

A label on the mower in front of the seat warns the operator to protect against death or serious injury:

> DO NOT OPERATE THE UNIT WHERE IT COULD SLIP OR TIP.
>
> . . . .
>
> BE SURE BLADE(S) AND ENGINE ARE STOPPED BEFORE PLACING HANDS OR FEET NEAR BLADE(S).
>
> . . . .
>
> BEFORE LEAVING THE OPERATOR'S POSITION, DISENGAGE BLADE(S), PLACE THE SHIFT LEVER IN NEUTRAL, ENGAGE THE PARKING BRAKE, SHUT OFF AND REMOVE KEY.

---

(...continued)

*Adams v. N. Ill. Gas Co.*, 809 N.E.2d 1248, 1254 n.2 (Ill. 2004). ANSI standards provide evidence of the custom or practice within an industry. *Leavitt v. Farwell Tower Ltd. P'ship*, 625 N.E.2d 48, 53 (Ill. App. Ct. 1993).

Malen had read and understood these admonishments, and over the next three years he operated the mower 30 to 50 times without incident. But then in October 2004 he was mulching leaves with the mower and wedged the right front tire over a curb. He tried without success to free the machine by rocking his weight in the seat and shifting gears between forward and reverse. At that point Malen raised the cutting deck, removed his foot from the pedal which engages the blade, and started to dismount. But he did not turn off the engine or listen to confirm whether the blade had stopped spinning. It had not. As Malen rose from the seat and stepped off the mower, his left foot slipped under the cutting deck and was struck by the rotating blade. The lacerations to the sole of his foot were severe, and he will not regain full use of his foot. It is undisputed that neither the OPC nor the NCR functioned when the accident occurred.

The Malens sued MTD Products and Home Depot in the Circuit Court of Cook County, Illinois. Donald Malen asserted common-law claims for strict products liability and negligence, and his wife claimed loss of consortium. The Malens contended that the lawn mower manufactured by MTD Products and sold by Home Depot was negligently manufactured and unreasonably dangerous because its OPC was not connected and thus inoperable. They also contended that the mower was negligently designed because MTD Products had shunned a "fail safe" system that would have made the cutting blade unusable even without the OPC connected. Finally, the plaintiffs claimed that the defen-

dants had failed to warn the operator about the defects in the mower. The defendants removed the suit to federal court under diversity jurisdiction. *See* 28 U.S.C. §§ 1332, 1441.

At his deposition Donald Malen gave the following account of his accident. When the right front tire dropped over the curb and became wedged against it, he tried to free the mower by shifting between forward and reverse and rocking in the seat with the engine running. When this effort was unsuccessful, Malen decided to dismount and lift the front of the mower back atop the curb. He lifted his foot from the pedal which engages the cutting blade; that effort, Malen thought, had stopped the blade, but he acknowledged the possibility that the pedal had been locked into the "on" position and that removing his foot from the pedal had not unlocked it. It was not his practice, Malen added, to dismount a riding mower with the blade spinning, but the engine was still running so he could not hear whether the blade was rotating. Malen, who did not know that the mower was designed with an OPC or NCR, then rose from his seat and put his left foot on the ground while swinging his right leg across the mower to the left. He slipped, and the blade caught his left foot and pulled him to the ground. He testified initially that the blade struck his boot and stopped for two to six seconds before resuming its rotation and cutting him when he tried pulling his foot away. Later in the deposition, however, Malen said "no" when specifically asked whether the blade had stopped on first contact with his boot. This apparent inconsistency

was never clarified. According to Malen, the entire ordeal—from the time he drove off the curb until his foot was cut by the blade—lasted "between 10 and 20 seconds." And, he said, it was a "very short time," more than the "clap of a hand" but probably only "a couple of seconds," between the time he rose from the seat and when his foot was sliced by the blade.

The defendants dispute Malen's testimony. They rely on the treatment notes of Dr. Narendra Patel, the emergency-room surgeon who repaired the lacerations on the sole of Malen's foot. In his notes Dr. Patel wrote that Malen had tried to dislodge the mower by planting his left foot on the ground, lifting the mower by the steering wheel, and stepping on the speed control. Yet at his deposition Dr. Patel could not recall the source of this account. And he conceded that the scenario described in his treatment notes would have resulted in lacerations to the top, not the sole, of Malen's foot.

Malen did not recall telling Dr. Patel how the accident happened. And Donald Pacheco, a mechanical engineer retained by Malen, rejected the chain of events described by Dr. Patel. Pacheco opined that the riding mower could not have been lifted by simultaneously depressing the speed control (what MTD Products calls the "go" pedal) and pulling on the steering wheel. The opposing forces from these actions, Pacheco said, would have canceled each other.

Pacheco's initial inspection had verified that the mower could be operated in forward, neutral, and reverse with the cutting blade engaged and no weight in the seat.

Another inspection conducted jointly with personnel from MTD Products reproduced this result, which, the parties agree, could not have happened if the OPC and NCR were functioning. Close examination disclosed that the wiring for the OPC and NCR was not connected. The contacts were grimy, so Pacheco knew that the wires had not been connected for some time. And after removing the dirt, he did not find scratches on any of the contacts, so he concluded that neither of the safety devices had been connected in the first place. Moreover, Pacheco was certain that the NCR was not connected when Home Depot sold the reconditioned machine, since Malen had run the mower in reverse with the blade engaged while testing it at the store. During the joint inspection, the wires to the OPC and the NCR were attached, and afterward both devices functioned properly. The cutting blade came to a full stop 2.6 seconds after the OPC was triggered, well below the existing (and current) ANSI limit.

Based on his inspections and review of Malen's deposition, Pacheco opined that the safety interlock system on Malen's reconditioned mower was defective. Pacheco surmised that Malen had inadvertently depressed and locked the pedal which engages the cutting blade. That pedal, had it been unlocked, would have disengaged the blade when Malen removed his foot. Still, Pacheco insisted, the OPC and NCR should have protected Malen against a blade that was locked in the "on" position. A functioning OPC, he reasoned, would have killed the engine as soon as Malen rose from the seat with the blade engaged. The very purpose of an OPC, Pacheco

explained, is to safeguard an operator who neglects to stop the blade before dismounting, e.g., when clearing an obstacle from the path of the mower. Likewise, Pacheco continued, a functioning NCR would have shut down the engine as soon as Malen put the mower in reverse without first disengaging the blade.

Pacheco also reported that a "fail safe" version of the OPC was available for this Yard-Man model well before Malen purchased his reconditioned unit. Pacheco explained that an OPC employs a switch to allow or inhibit the flow of an electric current. The OPC utilized when Malen's mower was built in 1998 was configured with a "normally closed" default: as long as the operator's weight remained in the seat, the OPC switch would stay "open" and prevent current from passing. But if the operator rose from the seat with the blade engaged, the switch would revert to its "normally closed" position and allow current to pass and activate a kill switch on the engine. If an OPC of this design is not connected, Pacheco continued, no current will ever reach and trigger the kill switch, whether or not there is weight in the seat. In effect, an unconnected OPC of this design is no different than having an operator in the seat at all times. By the time Malen's mower was built, Pacheco noted, MTD Products already had redesigned the OPC to be "normally open." The new version employed the operator's weight in the seat to close a switch and allow current to pass; if the circuit was open—either because the operator was not in the seat or the OPC was unconnected—the engine could not run. In June 1999 a service kit was developed to retrofit existing mowers

with the new design, and after December 1999 the new design was incorporated into all newly manufactured units. MTD Products did not issue a recall for the service kit. Pacheco installed one on Malen's mower and then disconnected a wire to test whether the redesigned OPC was "fail safe." After the OPC was disconnected, the engine died if the cutting blade was engaged. Pacheco opined that Malen's injury could not have occurred with the new design because the cutting blade was unusable unless the OPC was connected.

Pacheco's assessment is corroborated by deposition testimony from several employees of MTD Products. Mark Holland, the company's Manager of Standards Compliance, tested Malen's mower (before Pacheco installed the service kit) and confirmed that its engine and blade did not stop when he rose from the seat or put the machine in reverse. According to Holland, if all the systems were functioning correctly, the engine should have shut down. Michael Miller, a vice president of product development and safety, testified that the OPC was redesigned to be "normally open" because the "normally closed" version continued to draw current and drain the battery if the operator inadvertently left the key in the ignition. Gunter Plamper, the vice president of safety, conceded that MTD Products knew that the mower as originally designed would still operate if its safety interlock system failed. He also acknowledged that the riding mower purchased by Malen was designed so that users *could* disconnect the OPC or NCR and still use the mower, but he insisted that the two devices could not accidentally become disconnected.

Plamper authenticated a management directive that new consumer products be evaluated before production with an eye toward "possible hazards related to the use and/or misuse of the product."

MTD Products and Home Depot moved for summary judgment. The defendants argued that the Yard-Man sold to Malen was not unreasonably dangerous because the source of the danger—the rotating cutting blade, according to the defendants—was open and obvious to all users of the product. Malen knew the inherent risk, the defendants insisted, because his normal practice after 40 years of using riding lawn mowers was to disengage the blade before dismounting. And the particular mower was not defective, the defendants continued, because its OPC—when it was connected after the accident—functioned in compliance with ANSI standards, and Malen's evidence had not excluded the possibility that a third party disconnected the safety devices before Malen purchased the mower. The defendants also insisted Malen's own conduct, not a defect in the mower, was the proximate cause of his injury. Malen had testified that his foot slipped under the cutting deck within "a very short period of time" of touching the ground, and since the ANSI standard allows five seconds for an OPC to arrest the blade, the defendants reasoned that Malen would have been injured even if the OPC had been connected.

The Malens countered that the unconnected OPC, not the cutting blade, was the reason the reconditioned mower was unreasonably dangerous. That danger was

concealed, the plaintiffs maintained, though they also noted that Illinois does not shield against liability for injuries caused by an "open and obvious" hazard unless the nature of the risk outranks every other factor "to be considered in weighing the inherent design risks against the utility of the product as manufactured." *Blue v. Envtl. Eng'g, Inc.*, 828 N.E.2d 1128, 1145 (Ill. 2005). The plaintiffs insisted that the mower was defective because its OPC did not work and was not designed to be "fail safe," but they no longer pressed their theory that the defendants were liable for failing to warn Donald Malen about the missing safety devices. The plaintiffs further argued that factual questions remained in dispute concerning the cause of Malen's injury.

The district court granted the defendants' motion. *Malen v. MTD Prods., Inc.,* No. 05 C 6478, 2008 WL 4610295, at *9 (N.D. Ill. Oct. 10, 2008). The court accepted the defendants' premise that the cutting blade, not the unconnected OPC, was the source of danger in the lawn mower. *Id*. at *6. The court acknowledged, however, that the defendants could not escape liability simply by asserting that all riding lawn mowers are inherently dangerous. *Id*. Yet the court reasoned that summary judgment was appropriate on the ground that Malen's conduct had been the sole cause of his accident. According to the district court, the undisputed evidence established that Malen "(1) drove the Mower off the curb, (2) was aware of and understood the warning labels on the Mower, and (3) ignored those labels by dismounting the Mower with the cutting deck raised, the engine running, and the cutting blade engaged." *Id.* at *8. This view

of the evidence, the court noted, was consistent with Dr. Patel's account of the accident. *Id.* at *7. And since Malen was at fault, the court continued, it was unnecessary to decide whether the mower was defective. *Id.* at *6.

## II. DISCUSSION

The Malens argue on appeal that the district court erred in granting summary judgment for the defendants on the basis that Donald Malen's actions were the sole proximate cause of his accident and injury. The Malens insist that the reconditioned mower was negligently manufactured and unreasonably dangerous because it did not have a working OPC. The mower was also defective in design, the Malens contend, because the OPC used by MTD Products was not "fail safe." For their part, the defendants finally acknowledge the Malens' theory that the mower was defective because of the design and manufacture of its OPC, not because it has a cutting blade like all lawn mowers. The defendants have now abandoned their contention that the hazard was open and obvious, but they still contend that the plaintiffs' evidence would not establish that the mower was defective or that its OPC was a "substantial" cause of Malen's injury. According to the defendants, the plaintiffs' evidence does not exclude the possibility that a third party tampered with the mower, nor does their evidence establish that a properly functioning OPC would have stopped the blade quickly enough to prevent Malen's injury. The district court was correct to conclude, say the defendants, that Malen's negligence caused his injury.

We review the district court's grant of summary judgment de novo. *Rao v. BP Prods. N. Am., Inc.*, 589 F.3d 389, 395 (7th Cir. 2009). We will affirm the decision only if, viewing the facts in the light most favorable to the Malens, and drawing all reasonable inferences in their favor, we conclude that no material issue of fact is disputed and that MTD Products and Home Depot are entitled to judgment as a matter of law. *See India Breweries, Inc. v. Miller Brewing Co.*, 612 F.3d 651, 658 (7th Cir. 2010). In applying this standard we draw all reasonable inferences and resolve factual disputes in favor of the nonmoving party; here, the Malens. *Knight v. Wiseman*, 590 F.3d 458, 462 (7th Cir. 2009).

A federal court sitting in diversity applies state substantive law, *Milwaukee Metro. Sewerage Dist. v. Am. Int'l Specialty Lines Ins. Co.*, 598 F.3d 311, 316 (7th Cir. 2010); *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005), and the parties agree that Illinois law governs here. To prevail on a claim of strict products liability, the plaintiffs would have to prove that Malen's injury resulted from a condition which is attributable to the defendants and made the mower unreasonably dangerous. *See Kelso v. Bayer Corp.*, 398 F.3d 640, 642 (7th Cir. 2005) (applying Illinois law); *Mikolajczyk v. Ford Motor Co.*, 901 N.E.2d 329, 335 (Ill. 2008); *Hammond v. N. Am. Asbestos Corp.*, 454 N.E.2d 210, 216-17 (Ill. 1983). To prevail on their claim of negligence, the plaintiffs would have to prove that the construction or design of the mower breached a duty of care and was the proximate cause of Malen's injury. *See Johnson v. Wal-Mart Stores, Inc.*, 588 F.3d 439, 441 (7th Cir. 2009) (applying

Illinois law); *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir.), *cert. denied*, 130 S. Ct. 1025 (2009) (applying Illinois law); *Calles v. Scripto-Tokai Corp.*, 864 N.E.2d 249, 263 (Ill. 2007); *Blue*, 828 N.E.2d at 1141-42; *Jablonski v. Ford Motor Co.*, 923 N.E.2d 347, 366 (Ill. App. Ct.), *appeal allowed*, 932 N.E.2d 1030 (2010). Proof of causation, the linchpin of the district court's decision, is essential to both theories of liability. *See Suzik v. Sea-Land Corp.*, 89 F.3d 345, 348 (7th Cir. 1996) (applying Illinois law); *Kleen v. Homak Mfg. Co.*, 749 N.E.2d 26, 29 (Ill. App. Ct. 2001); *Wehmeier v. UNR Indus., Inc.*, 572 N.E.2d 320, 335 (Ill. App. Ct. 1991). We conclude that the district court erred when it granted summary judgment for MTD Products and Home Depot because a reasonable jury could find that Malen's lawn mower was defective in construction and design, and was the proximate cause of his injury.

### A. A Jury Could Find that the Lawn Mower was Defective.

The defendants argued on summary judgment that Malen's evidence would not sustain a jury finding that his reconditioned Yard-Man was unreasonably dangerous, or that it was negligently designed and assembled. The district court did not reach this contention, but the defendants are free to renew it and do. *See Bivens v. Trent*, 591 F.3d 555, 559 (7th Cir. 2010); *Srail v. Vill. of Lisle, Ill.*, 588 F.3d 940, 943 (7th Cir. 2009).

A jury could find that a riding lawn mower is defective if the machine lacks an OPC to stop the blade

should the operator lose control or disembark with the blade engaged. *Hubbard v. McDonough Power Equip., Inc.*, 404 N.E.2d 311, 315-17 (Ill. App. Ct. 1980); *accord Norton v. Snapper Power Equip., Div. of Fuqua Indus.*, 806 F.2d 1545, 1550 (11th Cir. 1987) (applying Florida law); *Eyre v. McDonough Power Equip., Inc.*, 755 F.2d 416, 420 (5th Cir. 1985) (applying Louisiana law); *see* 33 AM. JUR. 2D *Products Liability–Defective Design of Rotary Mower* § 12 (1983 & Supp. 2005). MTD Products and Home Depot have not questioned the plaintiffs' premise that a riding mower sold without a working OPC would fall short of industry standards and be defective, nor have they disputed that the reconditioned mower purchased by Malen did not have a functioning OPC (or NCR) at the time of his accident. Still, the defendants maintain, a jury could not find that the mower was defective because it was designed with an OPC, the device functioned within the ANSI parameter when connected after the accident, and the plaintiffs did not exclude the possibility that a third party disconnected the OPC after the mower was built in 1998.

Manufacturers and sellers are strictly liable for injuries caused by unreasonably dangerous products unless an unforeseen alteration by a third party introduced the unsafe condition. *See Peterson v. Lou Bachrodt Chevrolet Co.*, 329 N.E.2d 785, 786-87 (Ill. 1975); *Brdar v. Cottrell, Inc.*, 867 N.E.2d 1085, 1099 (Ill. App. Ct. 2007); *Monreal v. Waterbury-Farrel Foundry & Mach. Co.*, 646 N.E.2d 1337, 1340 (Ill. App. Ct. 1995); *Wiedemann v. Indus. Erectors, Inc.*, 483 N.E.2d 990, 997-98 (Ill. App. Ct. 1985). In this case MTD Products and Home Depot speculate that at some

point after assembly a "nefarious" person—perhaps even Malen—tampered with the mower and disconnected its OPC and NCR. And yet Malen testified that *he* did not disconnect either safety device after buying the mower, and the defendants produced no evidence to the contrary. Nor did they suggest that an interloper snuck into Malen's storage shed and disconnected these features. The principal inference the defendants seek to create is that a prior owner altered the lawn mower, but Donald Pacheco, Malen's expert, testified at his deposition that there were no scratches on the contacts where the wiring for the OPC and NCR should have been connected at the factory, a fact that led Pacheco to surmise that these safety devices were *never* connected before the accident.

The defendants did not submit much of their own evidence to directly challenge Pacheco's conclusion. Daniel Martens, the manufacturer's chief engineer for product safety, testified at his deposition that post-production quality assurance for this Yard-Man model was outsourced to ABS Technical Services; only a small number of units were shipped to company headquarters for an internal "audit," and Martens had not located evidence suggesting that Malen's mower was one of them. Martens insisted that a written protocol governed inspections done by ABS, but he did not produce a protocol and could not identify the purported document by name or even describe its contents. ABS did have a check-box form to document its inspections, but Martens conceded that the form was not always used and that MTD Products had not found a completed

form for the mower purchased by Malen. At his deposition Martens authenticated a completed form corresponding to a similar mower that had "passed" inspection by ABS, but he could not explain why the individual check box to verify testing of the OPC was unmarked. Nor was an explanation supplied by Mark Holland, who was responsible for standards compliance at MTD Products. Holland speculated that ABS had probably been unconcerned with the "little detail stuff" and was focused on a "bottom line" determination of whether the unit had passed or failed. And yet Holland was certain, he said, that ABS would have tested the OPC. The testimony from these witnesses does not foreclose the likelihood that the mower left the factory without a functioning safety interlock system. *See United States v. Warner*, 498 F.3d 666, 692-93 (7th Cir. 2007) (excluded evidence of previous sporadic rate increases was not type of regular response to specific, repetitive situation that would allow finder of fact to infer that increase initiated by defendants was routine); *Thompson v. Boggs*, 33 F.3d 847, 854 (7th Cir. 1994) (under Federal Rule of Evidence 406 habit is established only through evidence of practice sufficiently uniform and regular that finder of fact could conclude that practice was undertaken almost always); *Simplex, Inc. v. Diversified Energy Sys., Inc.*, 847 F.2d 1290, 1293-94 (7th Cir. 1988) (district court properly refused to admit evidence of late deliveries and defective performance on unrelated contracts as evidence that company's "habit" was to engage in such practices). Neither witness was qualified to say how ABS routinely conducted its testing, and their

speculation about the regularity or thoroughness of the process would not preclude a jury from inferring that Malen's mower was never subjected to a comprehensive inspection procedure that was uniformly applied to all production. *See Truhlar v. U.S. Postal Serv.*, 600 F.3d 888, 893 (7th Cir. 2010) (speculation about motive for union representative's conduct was insufficient to resolve issue at summary judgment); *Malawy v. Richards Mfg. Co.*, 501 N.E.2d 376, 390-91 (Ill. App. Ct. 1986) (manufacturer of failed medical device could not overcome summary judgment on claim for indemnity against hospital by relying on expert's speculation that unknown hospital employee had mishandled device); *Tardella v. RJR Nabisco, Inc.*, 178 A.D.2d 737, 737-38 (N.Y. App. Div. 1991) (summary judgment proper for candy manufacturer where company's detailed evidence of quality-assurance procedures would preclude jury from reasonably finding that pin in plaintiff's candy bar was present when it left factory).

On this record, then, a jury reasonably could find that Malen's mower was shipped from the factory in 1998 with its OPC still unconnected. That defect would make the mower unreasonably dangerous if the theory is strict products liability. And the very nature of the defect—a safety device that would have functioned except that it was never wired during assembly—also establishes a breach of the standard of care if the theory is negligent manufacture. *See Todd v. Societe Bic, S.A.*, 21 F.3d 1402, 1412 (7th Cir. 1994) (en banc) (applying Illinois law of negligent design); *Phillips v. U.S. Waco Corp.*, 516 N.E.2d 670, 674 (Ill. App. Ct. 1987) (same).

Significantly, though, the defendants have not explained why it matters for strict liability whether the OPC was connected during assembly. As noted, the exclusion of liability for unsafe conditions created by consumers does not hold for modifications that are fore-seeable and easily accomplished. *Brdar*, 867 N.E.2d at 1099; *Davis v. Pak-Mor Mfg. Co.*, 672 N.E.2d 771, 775 (Ill. App. Ct. 1996); *Woods v. Graham Eng'g Corp.*, 539 N.E.2d 316, 318-19 (Ill. App. Ct. 1989); *Wiedemann*, 483 N.E.2d at 997-98; *DeArmond v. Hoover Ball & Bearing, Uniloy Div.*, 408 N.E.2d 771, 774 (Ill. App. Ct. 1980). During discovery MTD Products disclosed that consumers easily could override the OPC on the Yard-Man model owned by Malen; apparently it was enough to yank a single lead from its terminal. What's more, the defendants admitted that Malen's lawn mower was *designed* to permit continued operation if the OPC was uncon-nected. According to Gunter Plamper, the vice president of safety, MTD Products had expected that some owners would dislike the OPC and try to override it; the company had feared that greater damage and further safety issues might arise if the process of de-feating the OPC was made complicated. Perhaps this testimony was intended to bolster the inference that the OPC was disconnected after the lawn mower left the factory in 1998.

The defendants also ignore another wrinkle. What if MTD Products had not anticipated tampering or had made the task of disconnecting the OPC difficult? With strict liability, unforeseen defects introduced by prior owners cannot be attributed to manufacturers or sellers

when used goods are marketed as-is. *See Court v. Grzelinksi,* 379 N.E.2d 281, 282 (Ill. 1978); *Peterson,* 329 N.E.2d at 786-87; *Timm v. Indian Springs Recreation Ass'n,* 543 N.E.2d 538, 541-42 (Ill. App. Ct. 1989); *Abel v. Gen. Motors Corp.,* 507 N.E.2d 1369, 1376 (Ill. App. Ct. 1987). But Home Depot did not sell the mower to Malen "as-is." He bought a "reconditioned" unit backed by a "full manufacturer's warranty"; that much is beyond dispute because the advertisement is in evidence. What's missing are details about the reconditioning. We cannot tell from the record whether the defendants ever complied with a discovery demand to identify who reconditioned the mower; at summary judgment MTD Products simply denied performing the work and implied that it relies on "authorized dealers," which Home Depot was not. And yet the defendants have not suggested that Home Depot's ad was false or misleading, or that Malen was told by the sales associate that "reconditioned" really meant something less.

We have not found a controlling Illinois decision, but the defendants do not contend that Illinois courts would distinguish "reconditioned" products from those newly manufactured. Reconditioning or remanufacturing a product is different from servicing or repairing the item. Reconditioning extends the useful life beyond what was contemplated at the point of manufacture and effectively creates a new product. This court and others have recognized the distinction in assessing when a product is "first" sold for purposes of a statute of limitations or repose. *See Richardson v. Gallo Equip. Co.,* 990 F.2d 330, 331 (7th Cir. 1993) (applying Indiana law); *Arnold v.*

*Riddell, Inc.*, 882 F. Supp. 979, 987 (D. Kan. 1995) (applying Kansas law); *Divis v. Clarklift of Neb., Inc.*, 590 N.W.2d 696, 700-01 (Neb. 1999). The distinction was also noted in *Tidemann v. Nadler Golf Car Sales, Inc.*, 224 F.3d 719, 725 (7th Cir. 2000), a diversity action that included a claim of strict products liability under Illinois law. In that case the plaintiff had argued that reconditioned products, unlike used goods marketed without alteration, should be characterized as new rather than used, in particular when advertised as "like new." *Id*. We passed on whether the Illinois courts would endorse this position, *id*. at 726, but we recognized its acceptance in the *Restatement (Third) of Torts*, which underscores that consumers expect remanufactured or reconditioned products to present no greater risk of defect than if new, RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 8(c), cmt. I (1998); *see also* 63A AM. JUR. 2D *Products Liability* § 1302; AM. LAW OF PRODUCTS LIABILITY 3d § 37:8 (2010). The Restatement adopts the position that strict products liability is appropriate for remanufactured products, RESTATEMENT (THIRD) OF TORTS : PRODUCTS LIABILITY § 8(c) (1998), and the Illinois courts typically endorse the Restatement position in the absence of controlling authority, *e.g., Eckburg v. Presbytery of Blackhawk of Presbyterian Church (USA)*, 918 N.E.2d 1184, 1190 (Ill. App. Ct. 2009); *Vena v. Vena*, 899 N.E.2d 522, 526 (Ill. App. Ct. 2008); *Randall v. Lemke*, 726 N.E.2d 183, 185 (Ill. App. Ct. 2000); *Pratt v. Kilborn Motors, Inc.*, 363 N.E.2d 452, 454 (Ill. App. Ct. 1977). Courts in other states already have recognized that rebuilding or reconditioning a used product is akin to first manufacture and

thus the commercial sale of a reconditioned product can give rise to a claim of strict liability. *Peterson v. Super. Ct.*, 899 P.2d 905, 914 (Cal. 1995); *Arriaga v. CitiCapital Commercial Corp.*, 85 Cal. Rptr. 3d 143, 153 (Cal. Ct. App. 2008); *Gaumer v. Rossville Truck & Tractor Co., Inc.*, 202 P.3d 81, 86-87 (Kan. Ct. App. 2009); *Michalko v. Cooke Color & Chem. Corp.*, 451 A.2d 179, 183 (N.J. 1982); *Anderson v. Olmstead Util. Equip., Inc.*, 573 N.E.2d 626, 629-30 (Ohio 1991); *Crandell v. Larkin & Jones Appliance Co.*, 334 N.W.2d 31, 34 (S.D. 1983).

The plaintiffs have produced enough evidence to establish, by any of several means, that Malen's mower was unreasonably dangerous. And the evidence that the OPC was never connected at the factory also provides the foundation for the plaintiffs' claim against MTD Products for negligent manufacture. What's left is the plaintiffs' contention that the mower was further defective in design because its OPC was not "fail safe." On this question, too, there is sufficient evidence for a jury to find for the plaintiffs.

To establish liability on a theory of negligent design, a plaintiff must show duty, breach, proximate cause, and damages. *See, e.g., Calles*, 864 N.E.2d at 263; *Jablonski*, 923 N.E.2d at 366. Although strict liability is concerned only with the condition of the product, negligence involves a defendant's fault in addition to the product's condition. *Calles*, 864 N.E.2d at 263-64; *Jablonski*, 923 N.E.2d at 366; *Henry v. Panasonic Factory Automation Co.*, 917 N.E.2d 1086, 1091 (Ill. App. Ct. 2009). So in addition to showing that the product was defective, the plaintiff

must show that the manufacturer knew (or should have known) that the product was unsafe. *Calles*, 864 N.E.2d at 264; *Jablonski*, 923 N.E.2d at 367; *Sobczak v. Gen. Motors Corp.*, 871 N.E.2d 82, 94 (Ill. App. Ct. 2007).

MTD Products insists that the design of the Yard-Man could not have been negligent because the design incorporated an OPC. But that contention misunderstands Malen's claim. He does not contend that the design was flawed because no provision was made for an OPC; he claims instead that MTD Products should have made the OPC "fail safe," meaning that if (and in Malen's case, when) the OPC failed, the mower should have been inoperable. A design defect is established by evidence of a practical, cost-effective alternative that was technologically feasible and would have prevented Malen's injury. *See Hansen v. Baxter Healthcare Corp.*, 764 N.E.2d 35, 45 (Ill. 2002); *Kerns v. Engelke*, 390 N.E.2d 859, 863 (Ill. 1979); *Stallings v. Black & Decker (U.S.), Inc.*, 796 N.E.2d 143, 149 (Ill. App. Ct. 2003). Malen's expert, Pacheco, identified the service kit issued in June 1999 as a safer, readily available alternative. Under this "normally open" design, if the safety interlock system failed, the mower became inoperable. This revision, Pacheco noted, was first contemplated in October 1997, before Malen's mower was constructed, and the service kit to retrofit existing units was released before Malen's mower was reconditioned. That the revision was MTD Products' very own design, was conceived before Malen's mower was built, and was incorporated into later models is evidence from which a jury could find that the original, "normally closed" design was defective.

*See Jablonski*, 923 N.E.2d at 370-71 (concluding that whether manufacturer breached standard of care in design of gas tank was jury question where plaintiff's expert stated that manufacturer's upgrade kit evidenced safe and feasible alternative); *Sobczak*, 871 N.E.2d at 94-95 (concluding that jury should decide if design of fuel-management system was defective where manufacturer's engineers had acknowledged that company knew of safer alternative).

MTD Products countered that its redesign was not "foolproof" and thus could not raise an inference that the original design was defective. Again the company misses the point. Though Pacheco acknowledged that a consumer could conceivably bypass the new, "normally open" design, he also testified that the design was "fail safe": If the redesigned OPC was left unconnected at the factory or became disconnected without the consumer's knowledge, the mower would not run with the cutting blade engaged. A determined consumer might have been able to rewire the mower to bypass the OPC—i.e., the redesign was not foolproof—but it was undisputed that Malen's injury could not have occurred had he been using a Yard-Man with the redesigned safety inter-lock system. *See Berrier v. Simplicity Mfg., Inc.*, 563 F.3d 38, 63-64 (3d Cir. 2009) (applying Pennsylvania law in concluding that newly designed NCR, even though it could be bypassed, could have lessened or eliminated plaintiff's injury and thus evidenced that original design was defective); *Eyre*, 755 F.2d at 419-20 (applying Louisiana law in concluding that district court erred in setting aside verdict for plaintiff who proved that

feasible redesign of OPC would have prevented injuries sustained when plaintiff fell from riding mower).

Based on what we have explained above, we conclude that a reasonable jury could find that the lawn mower was defective.

### B. A Jury Could Conclude that the Mower Was the Proximate Cause of the Injury.

The district court concluded, however, that Malen's evidence establishes that he was injured because of his own negligence and not because of the defective mower; the defendants press this contention on appeal. Proximate cause encompasses two requirements: cause-in-fact and legal cause. *Young v. Bryco Arms*, 821 N.E.2d 1078, 1085-86 (Ill. 2004); *Lee v. Chi. Transit Auth.*, 605 N.E.2d 493, 502 (Ill. 1992). If multiple factors have combined to cause an injury, Illinois law asks whether the defendant's conduct was a "substantial factor" in bringing about the injury. *Young,* 821 N.E.2d at 1086; *Coole v. Cent. Area Recycling*, 893 N.E.2d 303, 310 (Ill. App. Ct. 2008). Drawing all inferences in favor of the plaintiffs, and viewing the facts in the light most favorable to them, we conclude that a trier of fact reasonably could find that the defective condition of the mower was the proximate cause of Malen's injury.

The defendants argue that no matter the theory of liability (strict liability or negligence) or the mower Malen would have been using (his own Yard-Man or one like it with the "fail safe" safety interlock system), the

timing of the events leading to his injury makes the existence of the OPC or safety interlock system irrelevant. According to the defendants, Malen was injured too quickly for the OPC to have made any difference. If this contention had been established conclusively by the evidence in the record, summary judgment for the defendants would have been appropriate. *See Kirby v. Langston's Furniture & Appliance, Inc.*, 631 So. 2d 1301, 1304 (La. Ct. App. 1994) (affirming judgment for lawn mower manufacturer on products-liability claim where plaintiff did not produce evidence that the presence of OPC would have prevented injury); *Gauthier v. McDonough Power Equip., Inc.*, 608 So. 2d 1086, 1090-91 (La. Ct. App. 1992) (same); *Wenzell v. MTD Prods., Inc.*, 336 N.E.2d 125, 132-33 (Ill. App. Ct. 1975) (affirming verdict for manufacturer of lawn mower where plaintiff failed to introduce evidence that mower's allegedly defective chain and sprocket caused injury). But the defendants start their clock from the point when Malen rose from the seat, and that is too late. The Yard-Man was equipped with an NCR, and had it been connected the motor would have died before Malen stood up. Malen already had shifted into reverse while trying to rock the mower free, so the NCR should have shut power to the engine because the blade was still engaged. More importantly, though, the time frame is subject to dispute. Malen testified that the whole ordeal—from when he tried to rock the mower free to when he cut his foot—lasted between 10 and 20 seconds, well beyond even the 5-second ANSI standard. And when the OPC was connected after the accident, the blade fully stopped in 2.6

seconds, only a fraction of a second longer than Malen's guess about the shortest possible interval between when he started to rise from the seat and when the blade first struck his foot. Malen was wearing a boot and the defendants submitted no evidence suggesting that a blade about to come to a full stop would have injured Malen's foot to the same extent as a blade turning un-abated at full power. The evidence must be viewed from the perspective most favorable to the plaintiffs, but even the scenario favoring the defendants would have given the blade time to stop before Malen tried to extract his foot from the cutting deck. In fact, however, the cutting blade continued to spin.

The defendants' principal argument though—and the basis of the district court's decision—is that Malen's own conduct and not the defective mower was the legal cause of his injury. Legal cause is established if the defendant's conduct is so closely tied to the plaintiff's injury that the defendant should be held legally responsible. *Simmons v. Garces*, 763 N.E.2d 720, 732 (Ill. 2002); *McCraw v. Cegielski*, 680 N.E.2d 394, 396 (Ill. App. Ct. 1996). Legal cause involves an assessment of foreseeability, in which Illinois courts ask whether the injury is of a type that a reasonable person would foresee as a likely result of his conduct. *Young*, 821 N.E.2d at 1086; *Lee*, 605 N.E.2d at 503. The district court reasoned that the defendants "could not have foreseen that any individual would drive a riding mower off a curb and dismount that mower with the cutting blades still engaged, all the while ignoring clearly placed warning labels cautioning the operator to turn off the engine and blades before dismounting." *Malen*, 2008 WL 4610295, at *8.

If Malen's conduct is relevant at all, the fact that he drove the mower off the curb is not. And neither is it relevant that he tried to dislodge the machine by shifting between forward and reverse while rocking the mower. The defendants did not submit any evidence that the mower's position on the curb caused Malen to slip or that the cutting deck was tilted in a way that exposed the blade. That the mower was wedged on the curb was Malen's *motive* for dismounting but, as far as this record shows, that is all. And when Malen dismounted, he already had ceased rocking the machine, so his unsuccessful use of this maneuver had no bearing on his injury. The defendants have never contended that while rocking the mower he lost his balance and fell beneath the blade.

Malen's disregard of a warning label directing him to shut off the engine before dismounting at least has superficial appeal, but this does not resolve the issue here. The plaintiffs concede that Malen had read and comprehended the printed warning label on the mower, and if the plaintiffs were still pursuing a claim for failure to warn about the unconnected OPC and NCR, the defendants might be able to rely on the label in defending that claim. *See Werckenthein v. Bucher Petrochemical Co.*, 618 N.E.2d 902, 908-09 (Ill. App. Ct. 1993); *Taylor v. Gerry's Ridgewood, Inc.*, 490 N.E.2d 987, 991-92 (Ill. App. Ct. 1986). But at summary judgment the plaintiffs abandoned their claim of a failure to warn, and the warning label on the mower has no bearing on the plaintiffs' remaining claims. If the mower was defective because of an unconnected or poorly designed safety

interlock system, warnings could not erase the defect or make the machine safe. *See Chapman v. Maytag Corp.*, 297 F.3d 682, 689 (7th Cir. 2002) (applying Indiana law); *Glover v. BIC Corp.*, 6 F.3d 1318, 1323 (9th Cir. 1993) (applying Oregon law); *Needham v. White Labs., Inc.*, 639 F.2d 394, 400 (7th Cir. 1981) (applying Illinois law).

In any event, when warnings are relevant, a jury ordinarily must decide whether the failure to follow them rendered a plaintiff's conduct unforeseeable. *See Wheeler v. Sunbelt Tool Co.*, 537 N.E.2d 1332, 1343 (Ill. App. Ct. 1989); *Thibault v. Sears, Roebuck & Co.*, 395 A.2d 843, 847 (N.H. 1978). And on this record nothing favors a decision for the defendants. Pacheco, Malen's expert, testified at his deposition that the Yard-Man's design allowed an operator to leave the mower running, dismount temporarily to move debris, and then resume mowing. Removing debris from the mower's path is a routine precaution that any careful operator would be expected to take, *see Campbell v. Kovich,* 731 N.W.2d 112, 115-16 (Mich. Ct. App. 2006); *Gore v. Ohio Dep't of Transp.*, 774 N.E.2d 817, 820 (Ohio Ct. Cl. 2002), and Pacheco opined that doing so without shutting off the engine is an acceptable practice so long as the mower is not left unattended. That ANSI standards mandate equipping riding lawn mowers with an OPC—a device intended to protect operators who dismount with the engine running—confirms that dismounting temporarily while leaving the engine running is common and ordinary use of a riding mower. *See Kirby*, 631 So. 2d at 1303.

Even if the defendants are correct that Malen was himself negligent and that it mattered, accidents are natural, foreseeable consequences of using certain products. *See* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIA-BILITY § 16 cmt. a (1998); *Buehler v. Whalen*, 374 N.E.2d 460, 464-65 (Ill. 1977); *Bean v. Volkswagenwerk Aktiengesellschaft of Wolfsburg, Germany*, 440 N.E.2d 426, 429 (Ill. App. Ct. 1982). This principle is known as the crashworthiness doctrine (or the "enhanced injury" or "second collision" doctrine), which Illinois has adopted. *Buehler*, 374 N.E.2d at 464-65; *see DePaepe v. Gen. Motors Corp.*, 33 F.3d 737, 739 (7th Cir. 1994) (applying Illinois law); *Nanda v. Ford Motor Co.*, 509 F.2d 213, 217-18 (7th Cir. 1974) (applying Illinois law); *Mack v. Ford Motor Co.*, 669 N.E.2d 608, 612 (Ill. App. Ct. 1996); *Oakes v. Gen. Motors Corp.*, 628 N.E.2d 341, 345 (Ill. App. Ct. 1994); *Seward v. Griffin*, 452 N.E.2d 558, 568 (Ill. App. Ct. 1983); *Bean*, 440 N.E.2d at 429; *Stahl v. Ford Motor Co.*, 381 N.E.2d 1211, 1214-15 (Ill. App. Ct. 1978). The doctrine applies to both strict liability and negligence, and to every person involved in the overall enterprise of a product, including distributors and retailers. *See Abco Metals Corp. v. Equico Lessors, Inc.*, 721 F.2d 583, 584 (7th Cir. 1983) (applying Illinois law); *Nanda*, 509 F.2d at 219; *Buehler*, 374 N.E.2d at 465; *Dunham v. Vaughan & Bushnell Mfg. Co.*, 247 N.E.2d 401, 404 (Ill. 1969). The premise underlying the crashworthiness doctrine is that some products, although not made for certain purposes—such as accidents—should nevertheless be reasonably designed to minimize the injury-producing effect of an accident. *Bean*, 440 N.E.2d at 429; *see Tafoya v. Sears Roebuck & Co.*, 884 F.2d 1330, 1337 (10th Cir. 1989), *overruled*

*on other grounds, Mile Hi Concrete, Inc. v. Matz*, 842 P.2d 198, 206 n.17 (Colo. 1992). A defect is not merely the conclusion that the product failed and caused injury, but that the product failed to provide the consumer with reasonable protection under the circumstances surrounding a particular accident. *Whitted v. Gen. Motors Corp.*, 58 F.3d 1200, 1205-06 (7th Cir. 1995) (applying Indiana law). The crashworthiness doctrine is consistent with the idea that although a defendant's conduct is not a proximate cause if some intervening act supersedes the defendant's negligence, a reasonably foreseeable intervening act, such as an accident, does not relieve the defendant of liability. *See Bentley v. Saunemin Twp.*, 413 N.E.2d 1242, 1245 (Ill. 1980); *Mack*, 669 N.E.2d at 613.

If the crashworthiness doctrine applies to riding mowers, the defendants were required to foresee certain accidents in the use of the mower—much like an auto manufacturer must foresee that its cars will sometimes be involved in accidents—and to provide consumers with reasonable protections under the circumstances surrounding particular accidents. Illinois has applied the doctrine to automobiles, *Buehler*, 374 N.E.2d at 464; *Mack*, 669 N.E.2d at 612; *Oakes*, 628 N.E.2d at 345; *Bean*, 440 N.E.2d at 428-29, but its highest court has not specifically addressed whether the crashworthiness doctrine applies to riding mowers.

The *Restatement (Third) of Torts* recognizes that the crashworthiness doctrine applies outside the automobile context. *See* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 16 cmt. a (1998). Other jurisdictions have

extended the doctrine to motorcycles, *Miller v. Todd*, 551 N.E.2d 1139, 1142 (Ind. 1990); *McDowell v. Kawasaki Motors Corp. USA*, 799 S.W.2d 854, 865-66 (Mo. Ct. App. 1990); airplanes, *McGee v. Cessna Aircraft Co.*, 188 Cal. Rptr. 542, 551 (Cal. Ct. App. 1983); *Duncan v. Cessna Aircraft Co.*, 632 S.W.2d 375, 382-83 (Tex. App. 1982) (applying New Mexico law), *overruled on other grounds*, 665 S.W.2d 414 (Tex. 1984); boat engines, *Pree v. Brunswick Corp.*, 983 F.2d 863, 866 (8th Cir. 1993) (applying Missouri law); *Rubin v. Brutus Corp.*, 487 So. 2d 360, 363-64 (Fla. Dist. Ct. App. 1986); fork lifts, *Weir v. Crown Equip. Corp.*, 217 F.3d 453, 460-61 (7th Cir. 2000) (applying Indiana law); *Habecker v. Clark Equip. Co.*, 942 F.2d 210, 214 (3d Cir. 1991) (applying Pennsylvania law); snowmobiles, *Smith v. Ariens Co.*, 377 N.E.2d 954, 957 (Mass. 1978); and tractors, *Kutsugeras v. AVCO Corp.*, 973 F.2d 1341, 1346 (7th Cir. 1992) (applying Wisconsin law); *Roe v. Deere & Co.*, 855 F.2d 151, 153 (3d Cir. 1988) (applying Pennsylvania law). We have not found an Illinois decision on point, but several states have explicitly recognized the application of the doctrine to riding mowers. *Baker v. Outboard Marine Corp.*, 595 F.2d 176, 177 n.1 (3d Cir. 1979) (applying Pennsylvania law); *Tafoya*, 884 F.2d at 1338-39 (applying Colorado law); *Young v. Deere & Co.*, 818 F. Supp. 1420, 1422 (D. Kan. 1992) (applying Kansas law); *Harrison v. McDonough Power Equip., Inc.*, 381 F. Supp. 926, 930 (S.D. Fla. 1974) (applying Florida law).

We see no principled basis to conclude that Illinois courts would require car manufacturers to foresee that accidents occur with automobiles, while allowing manu-

facturers of riding mowers to pretend that accidents involving riding mowers are uncommon. Accidents on riding mowers are foreseeable just as accidents on our roadways are. *See* CONSUMER PRODUCT SAFETY COMMIS- SION, RIDING LAWN MOWERS, http://www.cpsc.gov/ cpscpub/pubs/588.html (last visited Nov. 15, 2010) (esti- mating that 37,000 injuries related to riding-mower acci- dents were treated annually in hospital emergency rooms from 2003 through 2005); Vanessa Costilla & David M. Bishai, *Lawnmower Injuries in the United States: 1996 to 2004*, 47 ANNALS OF EMERGENCY MEDICINE 567, 569-70 (2006) (finding that between 1996 and 2004 the primary diagnosis was laceration for the 663,393 lawnmower injuries treated in United States emergency rooms). And the OPC is aimed at the precise circumstance in this case: an extremity comes into contact with the cutting blade while the operator is not fully in control of the mower. *See Klein v. Sears Roebuck & Co.*, 773 F.2d 1421, 1425 n.2 (4th Cir. 1985) (applying Maryland law); *Southland Mower Co. v. Consumer Prod. Safety Comm'n*, 619 F.2d 499, 514 (5th Cir. 1980); *Winters v. Country Home Prods., Inc.*, 654 F. Supp. 2d 1173, 1178 (D. Mont. 2009) (applying Montana law). Given the number of accidents, and that Illinois law recognizes that accidents are foreseeable when using certain products, Malen's injury here had to have been anticipated. What Malen did with the mower here may not have made him a model user, but that is not dispositive for the purposes of the crash- worthiness doctrine.

And so the district court's conclusion that Malen's behavior broke the chain of causation when he disregarded an explicit warning is not consistent with

the crashworthiness doctrine as adopted in Illinois. A jury could still conclude that the mower was unreasonably dangerous and that the absence of functional safety mechanisms was the proximate cause of Malen's injury. *See Black v. M & W Gear Co.*, 269 F.3d 1220, 1236 (10th Cir. 2001) (applying Oklahoma law in concluding that evidence of plaintiff's alcohol consumption was irrelevant to show causation when plaintiff's claim that mower lacking roll-over-protection was not crashworthy); *Pree*, 983 F.2d at 866 n.3 (applying Missouri law and stating that evidence of operator's intoxication is irrelevant in a strict tort liability action under crashworthiness doctrine). Whether or not Malen initiated a chain of events that ended with him being injured—by wedging the mower on the curb, attempting to rock it loose, and dismounting without cutting the engine—the crashworthiness doctrine obligated the defendants to foresee the potential for this type of accident. Thus, summary judgment for the defendants on this ground was improper.[2]

---

[2] MTD Products and Home Depot also assert that the absence of the ineffectual safety interlock system could not have been a substantial factor in causing Malen's injury because Malen did not know that the Yard-Man had an OPC or NCR and so he could not have been expecting the devices to protect him when he dismounted with the blade engaged. In the defendants' view, since Malen did not know that the mower was (theoretically) equipped with an OPC, he "cannot say that his actions would have been different had the OPC been

(continued...)

Lastly, even if Malen's actions can be characterized as negligent, this goes only to apportioning comparative fault. Under Illinois law, whether a claim is based on negligence or strict products liability, an injured party is barred from recovering only if the trier of fact finds that his conduct was more than 50% of the proximate cause of the injury for which recovery is sought. 735 ILCS 5/2-1116; *Tidemann*, 224 F.3d at 725; *Freislinger v. Emro Propane Co.*, 99 F.3d 1412, 1417 (7th Cir. 1996) (applying Illinois law); *Williams v. Brown Mfg. Co.*, 261 N.E.2d 305, 310 (Ill. 1970). Comparative fault applies so that former defenses such as contributory negligence, assumption of risk, and misuse of the product are merely damage-reducing factors. *Byrne v. SCM Corp.*, 538 N.E.2d 796, 815 (Ill. App. Ct. 1989); *Tennant v. Clark Equip. Co.,* 492 N.E.2d 632, 636 (Ill. App. Ct. 1986). So long as Malen's negligence (if there really was any at all) was not greater than 50% of the cause of his injury, the plaintiffs are not barred from recovering.

Based on the above, and drawing all inferences in favor of the Malens and viewing the facts in the light most favorable to them, we conclude that a jury reasonably could find that the defective condition of the mower was the proximate cause of Malen's injury.

---

(...continued)

connected." But when Malen dismounted he thought the blade had stopped. He testified that he lifted his foot off the blade engagement pedal and did not know that he had inadvertently locked the pedal down.

## III. CONCLUSION

The district court's grant of summary judgment is REVERSED, and the case is REMANDED for proceedings consistent with this opinion.